[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 14-14680
_____

D.C. Docket No. 8:13-cr-00462-VMC-TBM-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ERIC THOMAS,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(April 1, 2016)

Before HULL, JULIE CARNES, and CLEVENGER,[*] Circuit Judges.

HULL, Circuit Judge:

---

[*]Honorable Raymond C. Clevenger, III, United States Circuit Judge for the Federal
Circuit, sitting by designation.

After a jury trial, Eric Thomas, a federal prisoner, is serving a 96-month sentence, followed by a life term of supervised release, on his conviction for knowingly accessing with the intent to view child pornography.  On appeal, Thomas challenges the district court's denial of his motion to suppress evidence discovered on a HP desktop computer in his home.  After a careful review of the record and with the benefit of oral argument, we affirm.

## I.  PROCEDURAL OVERVIEW

On September 25, 2013, following a police search of Eric Thomas's home computers, a federal grand jury indicted Thomas for one count of knowingly accessing with the intent to view child pornography, in violation of 18 U.S.C. § 2252(a)(4)(B) and (b)(2).  Thomas filed a motion to suppress evidence gathered from the HP desktop computer at his home.  A magistrate judge held three hearings on the motion to suppress, on December 20 and 23, 2013 and February 5, 2014, and issued a report and recommendation ("R&R"), recommending a denial of Thomas's motion.  The district court adopted the R&R and denied the motion to suppress.

After a three-day trial, the jury found Thomas guilty of knowingly accessing with the intent to view child pornography.  On September 29, 2014, the district court sentenced him to 96 months' imprisonment followed by a life term of supervised release.  Thomas does not appeal his sentence but only his conviction

2

based on the denial of his suppression motion.  We thus review the evidence adduced at the suppression hearings, the arguments on the suppression motion, and the district court's ruling.

## II.  MOTION TO SUPPRESS

### A.    December 20, 2013 Suppression Hearing

At the December 20, 2013 hearing, Officer Matt Steiner of the Largo Police Department testified that he was the first officer to arrive at Thomas's house on July 21, 2012.  Officer Steiner stated that he arrived at approximately 11:11 a.m., in response to a telephone report that there was child pornography on a computer within the home.  He spoke to Caroline Olausen, Thomas's then-wife, who had contacted the police.

According to Officer Steiner, Olausen told him that, on the previous night, Thomas had appeared nervous and his heart was racing.  That morning, Olausen discovered eight to ten child pornography websites on a computer in their shared home.  She explained that she found the pictures after turning on the computer monitor and clicking "yes" when asked if she wanted to "restore the previous Internet Explorer session."  Olausen explained that the websites featured naked prepubescent and pubescent girls, some of whom were performing oral sex on adult men.

3

Officer Steiner testified that he learned that Thomas was sleeping, so he asked Olausen for consent to search the computers in the residence. Olausen told him that she and Thomas both used the computers, but Thomas used the computers more often than she did and used them for work purposes. Olausen then gave oral and written consent to search all of the electronic media in the residence, which included an HP desktop computer, a Dell desktop computer, a Toshiba tablet, and a Maxtor internal hard drive. She also consented in writing to the removal of "any property" from the home. Officer Steiner believed that Olausen had the authority to consent to a search and seizure because the computers were in an unlocked home office within the residence and Olausen used at least the HP desktop computer that had allegedly displayed the child pornography.

According to Officer Steiner, when he approached the HP desktop computer, two websites were in plain view and he could use the mouse to move between the sites. The websites were called "NNLollys" and "HDSchoolTeens," and both featured "pictures of young girls that had only their underwear on." The girls were not engaged in any sexual activity. Officer Steiner did not have to type in a password to view the computer screen. Officer Steiner stated that he did not conduct any forensic analysis of the computers. After viewing the websites on the HP computer, he provided "scene security" and "officer safety" while other agents

4

performed forensic analyses of the electronic media.  He departed from the Thomas residence at 1:37 p.m.

Detective Nathan Dix testified that he was a cybercrimes detective for the Largo Police Department and an agent on the Federal Bureau of Investigation's ("FBI") Child Exploitation Task Force.  He arrived at Thomas's house at 12:18 p.m., after Officer Steiner had begun the initial investigation.  Detective Dix stated that he received a briefing and then examined the home office area and the HP desktop computer, which was easily accessible within the office.  He concluded that there was child erotica, but no child pornography, on the two websites visible on the HP computer.  Notably though, Officer Steiner testified that the "NNLollys" website visible on the computer had links to other websites with terms indicative of child pornography.

Detective Dix spoke with Olausen after viewing the webpages.  Olausen confirmed that she had provided consent to search the computers and repeated why she had contacted the police.  According to Detective Dix, Olausen told him that she had arrived home earlier than expected the previous night.  She saw Thomas get up "very quickly" from "the area of his computer desk."  He was acting nervous and strange, and when she hugged him his heart was pounding.

Olausen continued that, when she woke up that morning, she turned on the monitor of the HP computer, restored the previous browsing history, and watched

5

eight to ten Internet windows appear.  The windows contained child pornography, in Olausen's opinion.  She saw nude pictures of 4-to-13-year old children and some of the children were in "sex poses" or being "sexually abused."  In one instance, there was an image with "an adult male penis and a completely nude child's vagina."  Detective Dix testified that the described images constituted child pornography.  He assumed that there were only two webpages left open on the HP computer when the police arrived because Olausen had mistakenly closed some of the tabs or was wrong about how many webpages she had seen.

Detective Dix further testified that Olausen stated that she and Thomas both used the computers, though "Thomas was the primary user of the computers because he worked from home and utilized them through his work."  Olausen explained that Thomas was normally "compulsive" about properly shutting down the computers, using pop-up-ware and spam filters, and deleting his Internet cookies.  At the end of Detective Dix's conversation with Olausen, Olausen again orally consented to a search of the computers and said that Thomas was asleep.

After this conversation, Detective Dix returned to the home office and conducted a forensic search of the Dell desktop computer.  He explained that he used a "forensic scan on-site preview tool to scan that hard drive for video and image files."  Eventually, Detective Corey Monaghan arrived in the room to scan the HP desktop computer using the "OS Triage" forensic search tool.

6

While Detective Dix was conducting the scan, Thomas woke up. Detective Dix saw Thomas walk toward the home office area, but Officer James Shinn intercepted him before he could enter. Officer Shinn told Thomas to go to the living room and he would explain what was happening. Detective Monaghan also left the home office to interview Thomas.

Detective Dix testified that Detective Monaghan was gone from the home office for about 40 to 45 minutes. During that time, Detective Dix completed the forensic scan of the Dell computer and began scanning the Toshiba tablet. When Detective Monaghan returned, he told Detective Dix that Thomas had revoked consent and they had to stop the search. Both officers stopped their forensic search tools. They seized all of the electronic media in the residence. Detective Dix believed that there was probable cause to seize the evidence and that there was a "high risk that evidence could be destroyed or deleted" if left in the Thomas household. Detective Dix testified that he did not discover any child pornography pursuant to his preliminary forensic reviews of the Dell computer and Toshiba tablet.

Officer James Shinn of the Largo Police Department testified that he arrived at the Thomas residence at 1:31 p.m. He was instructed by officers already present at the house that Thomas was sleeping in a bedroom and he should keep watch to

see if Thomas wakes up. Officer Shinn positioned himself so that he could see the bedroom.

From his post, Officer Shinn observed Thomas leave the bedroom and walk toward the office. According to Officer Shinn, Detective Monaghan spoke to Thomas and asked Thomas to go to the living room. Thomas, however, continued walking toward the office, so Officer Shinn blocked the doorway to the office and told Thomas to speak to Detective Monaghan. Officer Shinn testified that he was concerned about Thomas going into the office because there were tools in that room that could be used as weapons.

Thomas complied with Officer Shinn's directions and went to the living room to talk to Detective Monaghan. Officer Shinn could hear Detective Monaghan and Thomas's conversation from where he was standing. Officer Shinn testified that Detective Monaghan asked Thomas to consent to a search of the computers and Thomas replied, "Yes, that would be fine." Detective Monaghan then asked Thomas to fill out a consent-to-search form. Thomas agreed and began writing on the form, but then stopped and asked to see his wife. Detective Monaghan replied that Thomas could speak to Olausen after they dealt with the form.

At that point, according to Officer Shinn, Thomas started to equivocate about filling out the form. Thomas said that he would sign the form if he could

8

speak to Olausen.  Detective Monaghan urged Thomas to "make a clear decision," and when Thomas again asked to talk to Olausen, Detective Monaghan instructed him to make an "informed decision."  According to Officer Shinn, Thomas became increasingly upset and asked again to speak with Olausen.  Officer Shinn tried to explain to him that Detective Monaghan was attempting to protect his rights by soliciting a clear answer concerning consent to search.

Officer Shinn testified that Detective Monaghan left the living room to ask Olausen if she was willing to talk to Thomas.  Detective Monaghan came back and informed Thomas that Olausen did not want to speak to him.  Thomas then stated that his sister was a lawyer and he wanted to talk to her.  At that point, Detective Monaghan stopped the conversation, and Officer Shinn escorted Thomas to the front patio.  Officer Shinn thought the conversation between Thomas and Detective Monaghan lasted about five or six minutes.

**B.    December 23, 2013 Suppression Hearing**

Detective Monaghan was the sole witness at the second suppression hearing. Detective Monaghan testified that he was part of the Largo Police Department's Investigative Services Division and worked on cybercrimes.  He also worked on the FBI's Innocent Images Task Force, investigating online child exploitation.

According to Detective Monaghan, when he arrived at the Thomas residence at approximately 12:55 p.m., Detective Dix briefed him on what was happening

and informed him that Olausen had consented to a search of the computers.

Detective Monaghan was under the impression that Thomas was asleep in a

bedroom, so he proceeded to the office area.  He observed that access to the HP

computer was unrestricted and there were already two websites containing child

erotica displayed on the computer monitor.  At least one of the websites appeared

to contain links to child pornography.

Detective Monaghan stated that he initiated his use of the OS Triage forensic

preview tool at approximately 1:01 p.m.  The forensic tool completed a scan of the

HP computer's Internet history and computer registry within a minute.[1]  Detective

Monaghan reviewed the Internet history immediately and saw "websites with

names indicative of child pornography" and browser history consistent with what

Olausen had described.  The OS Triage tool saved the Internet history results to a

thumb drive.

Detective Monaghan testified that he left the forensic search running and

spoke to Olausen.  Olausen told him that the images she saw on the computer were

of "prepubescent" children.  Olausen also stated that she used the HP computer to

"Google" the Largo Police Department earlier that morning.  Detective Monaghan

---

[1]The OS Triage forensic preview tool was on a thumb drive, which Detective Monaghan plugged into the HP desktop computer.  The tool immediately gathered information from the computer's Internet history and registry.  It also did a more time-consuming secondary scan of the computer for images, videos, and "key words that match[ed] a list within the software of names indicative of child pornography."  Detective Monaghan ultimately cancelled the secondary search before that portion of the scan was complete.  The Internet history relied upon in the search warrant was available after the first scan.

hypothesized that the other six to eight child erotica/pornography websites Olausen had seen were not on the screen when the police arrived because Olausen had inadvertently closed the websites when she used Google that morning before calling the police.  Finally, Olausen stated that the HP computer was password protected and she and Thomas shared access to the password.

After Detective Monaghan turned his attention back to analyzing the Internet history, Thomas came out of the bedroom.  Detective Monaghan testified that he left the home office and met Thomas in the living room to explain why the police were in the house.  Thomas denied viewing child pornography, but admitted to accessing adult pornography, and immediately gave oral consent to search the computers in the home office.

Detective Monaghan asked Thomas to sign a consent-to-search form to memorialize his oral consent.  Thomas, instead of signing, asked to speak to Olausen.  Detective Monaghan testified that he "again asked [Thomas] if he wanted to sign the consent to search."  Thomas responded a second time that he wanted to speak to his wife.  Detective Monaghan walked away from Thomas to locate Olausen, who was waiting outside of the house.  Olausen did not want to speak with Thomas, so Detective Monaghan returned to the living room to convey this information to Thomas.  Thomas said that he would not sign the consent-to-search form until he talked to his wife.

11

After this ultimatum, Detective Monaghan attempted to "clarify" whether Thomas was consenting to the search, but Thomas continued to insist on talking to Olausen.  Thomas also mentioned that his sister was an attorney and he wanted to speak to her.  Detective Monaghan testified that, at that point, he determined that Thomas was revoking his oral consent.  Detective Monaghan went to the office area and told Detective Dix that consent had been withdrawn, and he shut down the OS Triage tool.  Data from the forensic scan showed that Detective Monaghan terminated the search at 1:50 p.m.  Detective Monaghan stated that he seized the computer media and planned to obtain a search warrant.  He did not want to leave the computers at the Thomas residence because, in his experience, the evidence would be destroyed.

Detective Monaghan testified that he later, on August 22, 2012, reviewed the results of the OS Triage forensic scan, looked at the websites listed in the Internet history, and discovered that at least one of the websites had an image of child pornography.  On August 24, 2012, Detective Monaghan obtained a federal search warrant.[2]  Detective Monaghan stated that he would have pursued a search warrant even without the forensic evidence.  After Detective Monaghan obtained the search

---

[2]The State Attorney's Office advised Detective Monaghan that the evidence he gathered at the house and from the forensic scan were insufficient to obtain a search warrant for any state offense.

12

warrant, he conducted a complete forensic analysis of the HP computer and found about 860 images of child pornography.

After the testimony concluded, Thomas argued that, under Georgia v. Randolph, 547 U.S. 103, 126 S. Ct. 1515 (2006), he negated Olausen's consent to search the computers, and therefore the officers acted illegally when they removed the thumb drive of forensic evidence and the computers from his home without his consent. Thomas also claimed that all of the evidence obtained pursuant to the federal search warrant was fruit of the poisonous tree, as the warrant application included the results of the OS Triage forensic scan.

The government responded that the withdrawal of consent does not require police officers to give back the evidence they have already gathered. It emphasized that Detective Monaghan obtained a search warrant based solely on the information stored on the thumb drive and did not search the HP computer again until he had the warrant. Additionally, the government asserted that there was probable cause to seize the computers, and the officers did not need a warrant because there were legitimate concerns that Thomas would destroy the evidence if they left the computers at the residence.

## C.    February 5, 2014 Oral Argument on Motion to Suppress

When the magistrate judge called for additional argument on the suppression motion, Thomas broadened his position and claimed that Randolph should be

13

expanded to require police officers to obtain both spouses' consent before searching a shared home when both spouses are present.  Thomas also argued that: (1) the officers did not have probable cause to seize the HP computer because Olausen's tip was unsubstantiated at the time of the seizure and the officers did not observe any child pornography on the HP computer; (2) Thomas "veto[ed]" Olausen's consent, so the police could not rely on her signed consent form authorizing them to seize any item in the house to justify removing the HP computer; (3) the police could not justify the seizure based on a disappearing-evidence exception to the warrant requirement because they had ample time to secure the premises and obtain a search warrant if they were truly concerned about the destruction of evidence; and (4) the warrant affidavit, even as written, did not establish probable cause because Detective Monaghan visited the websites over a month after Thomas allegedly opened them, and the contents may have changed during that time, or Thomas may have accessed the websites inadvertently.

The government argued three theories in support of the search and seizure. First, the government claimed that Olausen's consent allowed the officers to search and seize the computers and take the thumb drive.  Second, the government contended that the exigent circumstances exception to the warrant requirement allowed them to seize the computers to prevent Thomas from destroying the evidence.  Third, the government stated that under the plain view doctrine, officers

can seize obviously incriminating items without a warrant when they have lawful access to the items.  It argued that there was no dispute that the officers were lawfully within the Thomas residence, and it maintained that it was clear that the computers contained incriminating evidence based on (1) Olausen's statements, which were consistent on key points, (2) the visible child erotica websites, and (3) the initial results of the OS Triage forensic scan.

## D.    R&R and District Court's Ruling

The magistrate judge filed an R&R, recommending denial of Thomas's motion to suppress.  The magistrate judge found that Olausen "shared authority and access over the home, the home-office area, and the computers found therein."  The magistrate judge also found that Thomas "verbally consented to the search of the computers when first asked but shortly thereafter balked at signing a written consent to search form."  The forensic data that Officer Monaghan relied on to obtain the search warrant had been downloaded for nearly 50 minutes before Thomas withdrew his consent to search.

Based on these factual findings, the magistrate judge determined that the officers had Olausen's consent to enter the house and search and seize the computers.  Olausen's consent was valid because she shared control of the home and the computers, and even if she did not, the officers had a reasonable good-faith belief that she had the authority to consent to a search.  Therefore, the search and

15

seizure of data from the HP computer was consistent with the Fourth Amendment. The magistrate judge concluded that Thomas's later revocation of consent did not require suppression of the evidence the officers had already lawfully obtained: "neither the information obtained by the osTriage device nor the information developed from review of that information was the fruit of the poisonous tree."

The magistrate judge further found that the officers lawfully seized and HP computer and removed it from Thomas's house.[3]  According to the magistrate judge, there was probable cause to believe that there was child pornography on the HP computer based on the totality of: (1) Olausen's statement that she saw images that constituted child pornography;[4] (2) the officers' observation of child erotica on the computer with links to websites indicative of child pornography; (3) the Internet history displayed by the OS Triage device, which suggested that a user visited child pornography or child erotica websites the previous night; (4) Thomas's admission that he viewed adult pornography; and (5) Detective Monaghan's experience with child pornography investigations.  Furthermore,

---

[3]The magistrate judge found that there was not probable cause to seize Thomas's other electronic media.  However, there was nothing to suppress as a result of this finding because the police did not discover child pornography on the Dell computer or Toshiba tablet during their initial search of the Thomas residence, and they did not search the Dell or Toshiba again after the seizure.

[4]The magistrate judge remarked that Olausen's written statement concerning her discovery of child pornography on the HP computer, which she provided to Officer Steiner during the search, was "fairly consistent" with what each officer testified she said in conversation.

given the portable nature of the computer and its contents, and the fact that Thomas was aware of the nature of the police investigation, the magistrate judge concluded that it was reasonable for the officers to fear that the evidence would be destroyed and seize the HP computer without a warrant.

Finally, after finding that the search and seizure were lawful, the magistrate judge concluded that probable cause supported the search warrant, and the 860 images of child pornography were admissible.  After Thomas filed objections and the government responded, the district court adopted the magistrate judge's R&R and denied Thomas's motion to suppress.  This appeal followed.

## III.  DISCUSSION

On appeal, Thomas argues that Olausen did not have the authority to consent to a <u>forensic</u> search of the HP computer, and, in the absence of her consent, the police did not have a lawful ground for conducting a warrantless forensic scan of the computer.  Accordingly, Thomas maintains that the results of the forensic search and all of the evidence discovered after the police obtained a search warrant (based on an affidavit including the results of the OS Triage scan) must be suppressed as fruit of the poisonous tree.  Thomas also argues that <u>Randolph</u> was wrongly decided and should be revisited.[5]

---

[5]Additionally, Thomas appears to argue, in a single sentence unsupported by any citations, that Olausen's consent was invalid because it was not informed.  Thomas asserts that Olausen was unaware when she consented to a search of the computers that the police would use

17

## A.    Standard of Review

The denial of a motion to suppress is a mixed question of fact and law. United States v. Laist, 702 F.3d 608, 612 (11th Cir. 2012).  We review questions of law de novo and questions of fact for clear error, construing the facts in the light most favorable to the prevailing party below.  Id.  We will reverse for clear error only when we are "left with a definite and firm conviction that a mistake has been committed."  United States v. Rothenberg, 610 F.3d 621, 624 (11th Cir. 2010) (quotation marks omitted).

## B.    Third-Party Consent Rule

The Fourth Amendment guarantees people the right to be "secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.  Without a warrant, "a search is reasonable only if it falls within a specific exception to the warrant requirement."  Riley v. California, 573 U.S. ___, ___, 134 S. Ct. 2473, 2482 (2014).  One exception is that a warrantless search is lawful when a person with actual or apparent authority voluntarily consents to law enforcement officers conducting a search.  United States v.

---

a forensic tool to reach back into the Internet browser history.  Thomas's one conclusory sentence, however, is insufficient to raise the issue of knowing consent by Olausen.  See United States v. Jernigan, 341 F.3d 1273, 1283 n.8 (11th Cir. 2003) ("[A] party seeking to raise a claim or issue on appeal must plainly and prominently so indicate . . . .  At the very least, he must devote a discrete, substantial portion of his argumentation to that issue.").  We also note that Thomas did not raise this argument below.

18

Watkins, 760 F.3d 1271, 1279 (11th Cir. 2014); Bates v. Harvey, 518 F.3d 1233, 1243 (11th Cir. 2008).

When two people share common authority over "premises or effects," the consent of one person "is valid as against the absent nonconsenting person with whom the authority is shared." United States v. Matlock, 415 U.S. 164, 170, 94 S. Ct. 988, 993 (1974). The Supreme Court has explained that it is reasonable to recognize that any co-inhabitant can consent to a search of a jointly-controlled area because the co-inhabitants assume "the risk that one of their number might permit the common area to be searched." Id. at 171 n.7, 94 S. Ct. at 993 n.7.

In order to determine whether a person has the authority to consent to a search of shared property, courts ask whether there is "mutual use of the property by persons generally having joint access or control for most purposes." Id. Another formulation of this standard is whether the defendant has placed the items in question "in an area over which others do not share access and control." Randolph, 547 U.S. at 135, 126 S. Ct. at 1535 (Roberts, C.J., dissenting).[6]

## C.    **Randolph** Rule

In Georgia v. Randolph, the Supreme Court added an exception to this third-party consent rule, providing that when a physically present co-inhabitant expressly refuses to consent to a police search, such refusal is dispositive,

---

[6]Both parties cite Chief Justice Robert's Randolph dissent in their briefs, and Thomas uses this formulation.

regardless of the consent of a fellow co-inhabitant.  Id. at 114-17, 126 S. Ct. at 1523-25.  In that case, Defendant Randolph's wife called law enforcement to their shared home after a domestic dispute and informed the officers that there were "items of drug evidence" in the house.  Id. at 107, 126 S. Ct. at 1519.  Both the defendant and his wife were present when the police asked to search the home.  Id.  The wife consented, but the defendant unequivocally refused.  Id.  The law enforcement officers searched the house and discovered cocaine.  Id.  The Supreme Court suppressed the drug evidence, holding that the warrantless search was invalid as to Defendant Randolph.  Id. at 114-17, 126 S. Ct. at 1523-25.  It provided that "a physically present co-occupant's stated refusal to permit entry prevails, rendering the warrantless search unreasonable and invalid as to him."  Id. at 106, 126 S. Ct. at 1519.

The Supreme Court in Randolph also addressed the situation presented in this appeal: what to do when a co-tenant is asleep when the police knock on the door and another co-tenant gives consent to enter and search the residence.  547 U.S. at 121, 126 S. Ct. at 1527.  The Supreme Court responded to this scenario by stating that it was "drawing a fine line" with the Randolph rule, and that "if a potential defendant with a self-interest in objecting is in fact at the door and objects, the co-tenant's permission does not suffice for a reasonable search, whereas the potential objector, nearby but not invited to take part in the threshold

20

colloquy, loses out." Id. Thus, the Supreme Court expressly declined to require police to wake a sleeping co-tenant. See id.

## D.    Applicability of the Randolph Rule to Personal Effects

The Supreme Court crafted the Randolph rule in the context of the search of a residence. Both Thomas and the government acknowledge that it is an open question whether Randolph applies to searches of personal effects, such as computers. Indeed, federal appeals courts have split on this issue. Compare United States v. King, 604 F.3d 125, 135-37 (3d Cir. 2010) (holding that Randolph does not apply to searches of personal effects and that the police can search personal effects with one user's consent, even if the other user objects), with United States v. Murphy, 516 F.3d 1117, 1124 (9th Cir. 2008) ("[T]here is no reason that the rule in Randolph should be limited to residences.").

We need not settle the issue here, though. We see no error in the district court's finding that, in seeking a search warrant, Detective Monaghan relied on information obtained before Thomas even objected and attempted to revoke Olausen's consent to search the HP computer. See Laist, 702 F.3d at 612. Detective Monaghan did not continue searching after Thomas expressed uncertainty about signing the written consent form, so assuming that Olausen had the authority to consent to a search in the first place, the law enforcement officers complied with the Randolph rule.

Therefore, whether the applicable rule for searching personal effects is the Randolph rule or the general principle that anyone with shared control over the property can consent to a search (regardless of the other's party's objection), the only issue in this case is whether Olausen had actual or apparent authority to consent to a forensic search of the computer, even though Thomas had taken steps to prevent her from viewing his Internet history.  We answer this question in the affirmative.

### E.    Olausen's Authority to Consent

When the police obtained Olausen's consent to search the HP computer and undertook the forensic scan, they knew that: (1) the computer was easily accessible and located in an unlocked room in the Thomas's shared residence; (2) Olausen had access to the computer and had used it that morning; and (3) Olausen and Thomas shared the password to access the computer.  Based on this information, it appeared that Olausen had control and authority over the HP computer, and could consent to a forensic search.  See Matlock, 415 U.S. at 170, 94 S. Ct. at 993.

The fact that Thomas was the primary user of the computer, worked from home, and typically deleted his Internet history, used pop-up-ware and spam filters, and usually fully shut down the HP computer (although he did not on the night in question) were insufficient to show that Olausen lacked the requisite common authority to provide consent.  Despite Thomas's security measures,

Olausen had "joint access or control [over the computer] for most purposes," and Thomas did not isolate his Internet use in a manner that prevented Olausen from accessing it all together. See Randolph, 547 U.S. at 135, 126 S. Ct. at 1535 (Roberts, C.J., dissenting); Matlock, 415 U.S. at 171 n.7, 94 S. Ct. at 993 n.7.

We find it particularly significant that Thomas did not protect his Internet history from Olausen by maintaining a separate login name and password or by encrypting his files. See United States v. Stabile, 633 F.3d 219, 232-33 (3d Cir. 2011) (holding that there was valid consent to search and seize computer hard drives when the defendant did not password-protect the computers and the computers were located in a common area of the house); United States v. King, 604 F.3d 125, 137 (3d Cir. 2010) (determining that a defendant who placed his hard drive in a shared computer that lacked password protection assumed the risk that the other user would consent to a search); Trulock v. Freeh, 275 F.3d 391, 403 (4th Cir. 2001) (holding that the defendant did not assume the risk that other users of a shared computer would permit a third-party to search his password-protected files); see also United States v. Andrus, 483 F.3d 711, 718-20 (10th Cir. 2007) (stating that password protection and the location of the computer are factors in determining who has authority to consent to a forensic search of the computer). Without separate passwords, encryption, or like measures, Olausen and Thomas shared access to the HP computer and all of its data, and by doing so, assumed the

23

risk that the other would allow the police to view the computer's contents. See Matlock, 415 U.S. at at 171 n.7, 94 S. Ct. at 993 n.7.

## F.    Heightened Privacy Interest

We also hold that Olausen had the authority to consent to a forensic search of the HP computer even in recognition that the Supreme Court, in Riley v. California, noted a heightened privacy interest in cell phones—which the Supreme Court called "minicomputers." The Riley Court held that the search-incident-to-arrest exception to the warrant requirement does not empower law enforcement officers to search the contents of an arrestee's cell phone. Riley, 573 U.S. at ___, 134 S. Ct. at 2484-85. It noted that the typical search incident to arrest turns up a limited quantity of evidence—namely, those items that are on the arrestee's person, such as a wallet—whereas the search of cell phone data could reveal more information than an "exhaustive search of a house." Id. at ___, 134 S. Ct. at 2489-91.

While this reasoning played a central role in the Supreme Court's analysis of the search-incident-to-arrest rule, we find it less critical to our analysis because the Supreme Court has already approved of exhaustive searches in the consent-based search context. In Matlock itself, for example, the Supreme Court upheld the consent-based search of a home, including the defendant's bedroom and closet. 415 U.S. at 166-67, 177, 94 S. Ct. at 991, 996. Again, the touchstone of the third-

24

party consent rule is assumption of the risk, and a person sharing access to a computer, just as a person sharing access to a home, exposes himself to a police search based on another's consent.

## G.     Summary: Fruits of the Search Warrant were Admissible

We hold that Olausen had authority to consent to the forensic search of the shared HP computer in her home, and thus there was no Fourth Amendment violation when Detective Monaghan conducted the OS Triage forensic scan based on Olausen's consent.  Even assuming arguendo that Randolph applied to the search, there was no Fourth Amendment violation because the officers stopped their search when Thomas seemed to object.

Furthermore, the only information Detective Monaghan relied on in obtaining the search warrant was data collected prior to Thomas's objection. Therefore, we hold that all of the fruits of the search following the issuance of the warrant were admissible.[7]

## H.     Overturning or Extending Randolph

As a final note, we address Thomas's argument that Randolph was wrongly decided.  Thomas believes that Randolph should be overturned and replaced with a flexible rule that analyzes objective indicia of the defendant's intent to keep

---

[7]Because we find Olausen's consent to the forensic search was valid until Thomas objected, we need not examine whether any other warrant exception, such as plain view or disappearing evidence, would have allowed the police to search the HP computer.

materials private, not a bright-line rule based on the defendant's ability to object to a search.  As Thomas acknowledges, however, Randolph is binding precedent, and we are not free to overturn it and fashion a new rule in its place.  See United States v. Thomas, 242 F.3d 1028, 1035 (11th Cir. 2001) (stating the well-known rule that we are bound to follow Supreme Court precedent "unless and until the Supreme Court itself overrules th[e] decision").[8]

Thomas also appears to argue that Randolph should be extended to require the police to wake a sleeping but present co-occupant when there is evidence that the co-occupant is the primary user of the effect (here a computer) or area to be searched.  We decline to extend Randolph in this fashion when the Supreme Court made clear that Randolph was a narrow rule, simple and formulaic in application. See Randolph, 547 U.S. at 122, 126 S. Ct. at 1528.  The Supreme Court expressly declined to require "the police to take affirmative steps to find a potentially objecting co-tenant before acting on the permission they . . . already received." Id. at 122, 126 S. Ct. at 1527.

However, even if there should come a time when the Supreme Court extends or overrules Randolph in the manner Thomas desires, as we explain below, our result today would stand under the independent source doctrine, which provides the basis for an independent and alternative ruling here.

---

[8]Thomas raises this argument primarily to preserve it for further review.

## IV.  INDEPENDENT SOURCE DOCTRINE

Under the independent source doctrine, when law enforcement officers use evidence gathered after an arguable violation of the Fourth Amendment to secure a warrant, this Court applies a two-part test to determine whether the evidence seized pursuant to the warrant is admissible.  United States v. Albury, 782 F.3d 1285, 1291 (11th Cir. 2015).  First, this Court excises from the affidavit filed in support of the warrant application any information gained from the illegal search and determines whether the remaining information supports a finding of probable cause.  Id.  Probable cause exists where, under the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in a particular place.  Id.  If the remaining information supports a finding of probable cause, this Court next determines whether the officers' decision to seek the warrant was prompted by what they saw during the illegal search.  Id.  If the warrant would have been sought without the illegality, then the evidence seized pursuant to the warrant is admissible.  Id. at 1291-92.

As the government argued below and now on appeal, the evidence seized from Thomas's computer pursuant to the search warrant was admissible under the independent source doctrine.[9]  Thomas does not contend that Olausen lacked

---

[9]The district court did not address the independent source doctrine, but "we may affirm the denial of a motion to suppress on any ground supported by the record."  United States v. Caraballo, 595 F.3d 1214, 1222 (11th Cir. 2010).

27

authority to invite the police into the home and show them the two websites that were on the computer screen. He objects only to Olausen's authority to consent to a forensic search of the HP computer. Thus, we excise from the warrant the results of the OS Triage scan and the information that Detective Monaghan later gathered from analyzing the results. See id. at 1291.

Removing these facts from the affidavit, there was still enough evidence to support a finding of probable cause. See id. The affidavit provided that: (1) Olausen observed her husband acting nervous and then discovered images qualifying as child pornography on the HP computer; (2) the police observed on the computer two websites containing child erotica, one of which had links with names indicative of child pornography; and (3) based on training and experience, the majority of people who view child pornography also collect child erotica, such that the presence of child erotica suggests the presence of child pornography.

Based on these facts, there was a fair probability that child pornography would be found on the HP computer. See id. The officers may not have been able to corroborate Olausen's statement that she originally viewed eight to ten websites containing child pornography, but her statement was sufficiently reliable. Specifically, she risked incriminating herself by contacting the police about illegal images on a computer she used and, as the magistrate judge found, her written and oral statements were always consistent on key points. Further, that Olausen saw

28

eight to ten images that morning but only two were left when the police arrived was not inconsistent.  Rather, Olausen admitted that she used Google to locate the Largo Police Department's contact number, which apparently left only two of the websites open.

As to the second prong of the independent source doctrine, Agent Monaghan testified at the suppression hearing that he would have sought a search warrant in this situation, regardless of the results of the OS Triage scan.  Thus, law enforcement would have sought the search warrant even without the fruits of the allegedly illegal forensic search, and the evidence ultimately obtained pursuant to the warrant was admissible under the independent source doctrine.  See id. at 1291-92.

## V.  CONCLUSION

For all of the foregoing reasons, we affirm the judgment of the district court.

**AFFIRMED.**