[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-10715
Non-Argument Calendar

_____

D.C. Docket No. 5:18-cr-00033-RH-MJF-1

UNITED STATES OF AMERICA,

Plaintiff–Appellee,

versus

CRUZ WHITSETT,

Defendant–Appellant.

_____

Appeal from the United States District Court
for the Northern District of Florida

_____

(March 10, 2020)

Before WILSON, LUCK, and ANDERSON, Circuit Judges.

PER CURIAM:

Cruz Whitsett was charged in August 2018 was possession with intent to distribute methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C); possession of a firearm in furtherance of a drug-trafficking crime, in violation of 18 U.S.C. § 924(C)(1)(A)(i); and possession of a firearm by a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2).  The charges arose out of an August 2017 search warrant executed by the Bay County, Florida, Sheriff's Office.  He pleaded guilty pursuant to a plea agreement, but he objected to the PSI's inclusion of methamphetamine that was found in his house pursuant to a July 2018 search of his residence.  The district court overruled his objection and sentenced him to a 144-month prison term.

Whitsett appeals his sentence, arguing that the district court incorrectly calculated his guideline range based on its finding that drugs seized in July 2018, nearly a year after an August 2017 seizure underlying his offenses of conviction, were relevant conduct for the purposes of U.S.S.G. § 1B1.3, thereby increasing his base offense level.  He asserts that there was no credible evidence that he was ever present with the July 2018 drugs, only slight evidence connected him with the bedroom in which the drugs were found, and the drugs were discovered at a different residence than the August 2017 drugs.  He also argues that the court

clearly erred in alternatively finding that he was responsible for the July 2018

drugs on the basis that they were part of a jointly-undertaken activity. He also

argues that the district court erred in finding that the July 2018 drugs were "part of

the same course of conduct or common scheme or plan as the offense of

conviction." U.S.S.G. § 1B1.3(a)(2). Finally, he argues that the district court

made insufficient findings. Although we reject Whitsett's argument that there was

insufficient evidence that the July 2018 drugs belonged to him (or were part of a

jointly undertaken activity), for the reasons discussed below, we vacate Whitsett's

sentence and remand the case to the district court for resentencing.

## BACKGROUND

In August 2018, Whitsett was charged in a three-count indictment that

alleged, *inter alia*, that he possessed methamphetamine with intent to distribute, in

violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C). He pleaded guilty to all three

counts pursuant to a plea agreement.

The Presentence Investigation Report detailed the offenses giving rise to the

instant charges. In August 2017, the Bay County, Florida, Sheriff's Office

received information from a confidential informant that Whitsett was selling

methamphetamine from his residence. The Sheriff's Office obtained and executed

a search warrant, discovering, among other illegal drugs, about 39 grams of

methamphetamine, 2 firearms, ammunition, and about $1,700 in cash. When he

3

arrived at his residence, and after being given a *Miranda* warning, Whitsett admitted that everything in the house was his and that he dealt drugs from a dresser drawer and his kitchen, where the contraband was found.

Almost a year later, the Sheriff's Office received information from a confidential informant[1] that Whitsett and Brandon Williams were trafficking methamphetamine and selling it out of Whitsett's residence.  The Sheriff's Office again obtained and executed a search warrant in July 2018.  When they arrived at the house, they discovered Williams and Almisha Whitsett, Whitsett's wife, at the house.  The officers discovered about 287 grams of methamphetamine in a shoebox and about 73 grams of cocaine in the master bedroom; a small baggie of suspected synthetic marijuana and a digital scale containing a white residue that tested positive for cocaine in the kitchen; about $1,500 in cash and a small baggie containing suspected marijuana in a rental car on the property; and about $1,900 in Almisha's car.

The PSI, applying the Sentencing Guidelines in force as of November 2018, stated that Whitsett should be held accountable for the converted equivalent of 665.93 kilograms of marijuana based on the amount of methamphetamine and

---

[1] It is not clear whether the same CI provided the Sheriff's Office with both the August 2017 and June 2018 tips, but our review of the record fails to uncover any evidence that the two tips were provided by the same person.

cocaine recovered in the August 2017 and July 2018 searches[2] because, under U.S.S.G. § 1B1.3, those drugs were part of the same acts and omissions giving rise to the offense of conviction.

In calculating Whitsett's offense level for Count One, the PSI assigned a base level of 26 based on a converted marijuana-equivalent weight of 665.93 kilograms, pursuant to § 2D1.1(a)(5).  Pursuant to § 3E1.1, Whitsett received a total 3-level acceptance-of-responsibility reduction, resulting in a total offense level of 23.  The PSI calculated a criminal history score of 11, which yielded a criminal history category of V.  Based on these calculations, Whitsett's guidelines range prison sentence was 84–105 months, plus a consecutive mandatory-minimum term of 60-month prison term for Count Two (possession of a firearm in furtherance of a drug-trafficking scheme).

Whitsett objected to the PSI's inclusion of the drugs seized in July 2018 in calculating the total quantity of drugs associated with the charged conduct.  He conceded the quantity of drugs seized in August 2017 but argued that the drugs

---

[2] We pause to note how this number was generated.  The PSI explains that the probation officer used a "Drug Conversion Table to combine the weights of differing controlled substances to obtain a single offense level."  Though the PSI does not include the Drug Conversion Table, it is found in the Sentencing Guidelines.  *See* U.S.S.G. § 2D1.1, cmt. 8(D).  The probation officer used marijuana-equivalent weight as the base for calculating the offense level.  Accordingly, the probation officer concluded that the marijuana-equivalent weight of 77.34 kilograms of methamphetamine had been seized in August 2017 and the marijuana-equivalent weight of 574.06 kilograms of methamphetamine and the marijuana-equivalent weight of 14.52 kilograms of cocaine had been seized in July 2018.  This number adds up to 665.92 kilograms, but the PSI calculated a total weight of 665.93 kilograms.  This minor calculation error is of no consequence.

from July 2018 should not be included because he had not been federally indicted on, or convicted by a state court of, any offense related to those drugs.

At the sentencing hearing, the district court heard testimony from Sergeant Raymond Scott of the Bay County Sheriff's Office. Scott testified that he had received the tip from the CI in June 2018 and that he participated in the execution of the search warrant of Whitsett's residence in July 2018. When law enforcement arrived at the house, they encountered Williams and Almisha. The search discovered cocaine and methamphetamine in a closet in the upstairs bedroom, and that mail containing both Almisha's and Whitsett's names was also in the closet. Whitsett's fingerprints were not on the shoebox where the methamphetamine was being kept. Whitsett was not present during the search and denied all knowledge and possession of the drugs when he was arrested the following week; he said that the drugs belonged to Williams and that he had no idea why they were in his bedroom closet.

Next, Deputy Jason Proctor, also of the Bay County Sheriff's Office, testified. He was also present when the search warrant was executed in July 2018 and he conducted an interview with Almisha. Proctor testified that Almisha told him that Whitsett was responsible for the drugs found and that he had dealt drugs for a long time. She refused to accept responsibility for the drugs and said that the

contraband was "his stuff . . . I swear I don't know nothin' about none of this shit." He testified that Almisha was subsequently charged in connection with the search.

Whitsett did not testify. He argued that the government had not met its burden that the drugs seized in both executions were part of the same acts giving rise to his offenses of conviction. He further argued that Scott's CI was unreliable because Scott had never used him before, but the district court noted that the information had been corroborated during the search. The government responded, in relevant part, that Whitsett's mail had been found in the closet, which demonstrated his dominion and control over that room.

The district court ultimately concluded that the methamphetamine found in July 2018 was relevant conduct under U.S.S.G. § 1B1.3 based on its finding that Whitsett possessed those drugs with intent to distribute. Further, the court stated that, even if it were to conclude that Williams or Almisha had placed the drugs in the home, the evidence supported a finding that the action was done as part of jointly-undertaken criminal activity for which Whitsett was responsible. The court also stated that, if the money discovered in Almisha's car constituted drug proceeds, Whitsett was responsible for the actions of his codefendants. The court stated that "[m]y finding is all of this was undertaken by Mr. Whitsett himself and, in any event, is within the scope of jointly undertaken criminal activity; and that Mr. Whitsett is responsible for it under 1B1.3." It ultimately imposed an 84-month

prison term for Counts One and Three and a mandatory consecutive term of 60 months' imprisonment on Count Two, which resulted in a 144-month prison term. The court stated that the guideline-range issue affected its determination as to an appropriate sentence, and that if it had ruled in Whitsett's favor on the relevant-conduct objection, his offense level would have been lower and he would have received a lower sentence. Whitsett timely appealed to us.

## ANALYSIS

We review the district court's application of the Sentencing Guidelines *de novo*. *United States v. Barner*, 572 F.3d 1239, 1247 (11th Cir. 2009). An error in the calculation of the guideline range warrants vacatur of the defendant's sentence unless that error is harmless—that is, unless the district court would not have imposed the same sentence without the error. *Id.* at 1247–48.

We review for clear error the district court's determination of the drug quantity attributable to a defendant. *United States v. Chavez*, 584 F.3d 1354, 1367 (11th Cir. 2009). We also review for clear error the district court's application of U.S.S.G. § 1B1.3 to the facts of a case. *United States v. Valladares*, 544 F.3d 1257, 1267 (11th Cir. 2008). We will reverse for clear error only where we are left with a definite and firm conviction that a mistake was committed. *United States v. Thomas*, 818 F.3d 1230, 1239 (11th Cir. 2016) (quotation omitted). A court's choice between two permissible views of the evidence will rarely constitute clear

8

error. *United States v. Valois*, 915 F.3d 717, 731 (11th Cir. 2019). Where a defendant objects to a factual finding that was used to calculate his guideline range, the government bears the burden of establishing the disputed fact by a preponderance of the evidence. *United States v. Rodriguez*, 398 F.3d 1291, 1296 (11th Cir. 2005).

The district court may consider uncharged conduct in determining an appropriate sentence. *United States v. Rushin*, 844 F.3d 933, 942 (11th Cir. 2016). In determining the applicable base offense level for a given offense, the court shall consider any relevant conduct, including, among other things, all acts and omissions committed by the defendant that occurred during the commission of that offense. U.S.S.G. § 1B1.3(a)(1)(A). Where the offense involved jointly-undertaken criminal activity, the court shall also consider, among other things, all acts or omissions that were within the scope of that activity, in furtherance of that activity, and reasonably foreseeable in connection with that activity, that occurred during the commission of the offense of conviction. *Id.* § 1B1.3(a)(1)(B). "A 'jointly undertaken criminal activity' is a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy." *Id.* § 1B1.3, cmt. n.3(A).

However, if the conduct of others is not within the scope of, in furtherance of, or reasonably foreseeable in connection with that activity, then it is not

9

"relevant conduct" for the purposes of section 1B1.3. *Id.* In determining whether conduct was within the scope of jointly undertaken criminal activity, the court must first determine the scope of the activity that the defendant agreed to jointly undertake. *Id.* § 1B1.3, cmt. n.3(B). In doing so, the court may consider any explicit or implicit agreement fairly inferred from the conduct of the defendant and others. *Id.* Where the district court simply held that each of the defendants could be held liable under section 1B1.3 for the acts of every co-conspirator because they were part of the same overall scheme, we held that the district court's failure to make particularized findings as to the scope of each co-conspirator's agreement in a larger conspiracy was clear error. *United States v. Hunter*, 323 F.3d 1314, 1320 (11th Cir. 2003) (vacating the defendants' sentences and remanding for the district court to make particularized findings regarding the scope of each defendants' agreement to participate in the conspiracy).

Further, where the offense is of a character that § 3D1.2(d) would require grouping of multiple counts, the court shall consider all acts and omissions described in sections 1B1.3(a)(1)(A) and (a)(1)(B) that were part of the same course of conduct or common scheme or plan as the offense of conviction. U.S.S.G. § 1B1.3(a)(2). "For two or more offenses to constitute part of a common scheme or plan, they must be substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose,

10

or similar modus operandi." *Id.* § 1B1.3 cmt. n.5(B)(i). As for whether offenses qualify as part of the "same course of conduct," courts shall consider whether they are:

> sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses. Factors that are appropriate to the determination of whether offenses are sufficiently connected or related to each other to be considered as part of the same course of conduct include the degree of similarity of the offenses, the regularity (repetitions) of the offenses, and the time interval between the offenses.

*Id.* § 1B1.3, cmt. n.5(B)(ii).

> We have stated that the commentary to section 1B1.3:

> is designed to take account of a pattern of misconduct that cannot readily be broken into discrete, identifiable units that are meaningful for purposes of sentencing. Thus, when illegal conduct does exist in discrete, identifiable units apart from the offense of conviction, the Guidelines anticipate a separate charge for such conduct.

*United States v. Maxwell*, 34 F.3d 1006, 1010–11 (11th Cir. 1994) (quotation omitted); *see also United States v. Blanc*, 146 F.3d 847, 853–54 (11th Cir. 1998) (citing *Maxwell* in holding that the district court did not err in finding that two fraud schemes were not part of the same act because they were "subject to meaningful subdivision into wholly discrete and identifiable units," notwithstanding similarities in their execution). In evaluating relevant conduct under section 1B1.3, we will consider the similarity, regularity, and temporal

11

proximity between the count of conviction and an extrinsic drug offense.  *Id.* at 1011.

In *Maxwell*, the defendant was convicted of conspiring to possess with intent to distribute dilaudid.  *Id.* at 1007.  Based on the quantity of drugs involved in that conspiracy, which also included the sale of a small amount of cocaine, the defendant's base offense level would have been 18.  *Id.* at 1010.  However, the court relied on extrinsic offense evidence from the defendant's trial in finding that, more than a year earlier, he sold an additional 546 grams of cocaine for which he had not been charged.  *Id.*  The court included that additional quantity as "relevant conduct" under section 1B1.3, which resulted in a base offense level of 26.  *Id.* We held that the district court clearly erred in attributing the uncharged cocaine quantity because: (1) the buyer of the 546 grams of cocaine was not involved in the dilaudid conspiracy, nor did he buy dilaudid from the defendant; (2) the sale of the small quantity of cocaine during the dilaudid conspiracy occurred more than a year after the sale of the 546 grams of cocaine; and (3) there were no "distinctive similarities" between the dilaudid distribution scheme and the cocaine distribution scheme that signaled that they were part of a single course of conduct.  *Id.* at 1011. We stated that "the two offenses appear to be isolated, unrelated events that happen only to be similar in kind.  We do not think that two offenses constitute a single course of conduct simply because they both involve drug distribution."  *Id.*

12

(quotation and footnote omitted).  Quoting the Fourth Circuit, we stated that to so conclude would be:

> to describe the defendant's conduct at such a level of generality as to eviscerate the evaluation of whether uncharged criminal activity is part of the "same course of conduct or common scheme or plan" as the offense of conviction.  With a brushstroke that broad, almost any uncharged criminal activity can be painted as similar in at least one respect to the charged criminal conduct.

> *Id.* (quotation and brackets omitted).

Based on the record before us, we conclude that the government did not meet its burden of establishing the disputed fact by a preponderance of the evidence.  Clear-error review accords a high level of deference to the district court's finding of fact that the extrinsic July 2018 offense was part of the same acts giving rise to Whitsett's offenses of conviction—*i.e.*, part of the same course of conduct or common scheme or plan.  For the following reasons, the district court's finding in that regard leaves us with the "definite and firm conviction that a mistake has been committed."  *Thomas*, 818 F.3d at 1239 (quotation omitted).  This is not a simple matter of choosing between two permissible views of the evidence—in our view, there is *no* permissible view of the evidence in the sentencing hearing record supporting the district court's finding.  Here, we do not think that the evidence supports a finding that the July 2018 drugs are part of the same course of conduct or common scheme or plan with Whitsett's August 2017 offense of conviction.

13

As explained previously, "[f]or two or more offenses to constitute part of a common scheme or plan, they must be *substantially connected* to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar modus operandi."  U.S.S.G. § 1B1.3 cmt. n.5(B)(i) (emphasis added).  We think that all of these potential commonalities are lacking.  There is no suggestion in the record that the offense conduct involved common victims.  Nor is there any evidence indicating that the August 2017 conduct and July 2018 conduct involved the same accomplices.  The government's argument that Whitsett could still be responsible for the July 2018 conduct if Williams and Almisha were co-conspirators cuts against it—there is no mention of either of them in connection with the August 2017 offenses.  Whitsett claimed *sole* responsibility for the August 2017 conduct and there is no indication that the same CI provided information relating to both instances.  And short of the government's allegation that both sets of drugs were possessed with an intent to distribute,[3] there is no evidence suggesting some unique (or more specific) purposes that would tie the two offenses together.  *Maxwell*, 34 F.3d at 1011; *Blanc*, 146 F.3d at 853–54.  Finally, there is no evidence of any uniquely identifiable part of Whitsett's *modus operandi* beyond the mere possession of drugs and drug paraphernalia suggesting an intent to

---

[3] This sort of allegation would seem to apply broadly to *any* possession-with-intent-to-distribute offenses and would serve as an exception to § 1B1.3's requirement of commonality that swallows the entire rule.  We cannot endorse such a broad purpose in this context.

14

distribute.  There was no particular methodology of distributing, packaging, or preparing the drugs.  We warned in *Maxwell* against finding that otherwise discrete offenses constituted parts of a common scheme or plan based solely on the fact that they both involved activity fundamental to drug distribution.  The mere presence of drugs in commonly-utilized rooms of a home is an overly broad basis for determining that otherwise distinct conduct was related for the purposes of section 1B1.3, as one would expect that drugs would be found in such rooms in many possession with intent to distribute cases.  34 F.3d at 1011; *Blanc*, 146 F.3d at 853–54.

Accordingly, we conclude that the district court clearly erred in finding that those drugs were part of relevant conduct under section 1B1.3.  Further, any such error was not harmless because the court *expressly* stated that Whitsett would have received a lower sentence but for its relevant-conduct finding.  Accordingly, we vacate Whitsett's sentence and remand for resentencing.[4]

**VACATED AND REMANDED.**

---

[4] We note, however, that nothing in this opinion precludes the district court from determining once again that the July 2018 constituted relevant conduct if it conducts another hearing and gathers sufficient evidence to support such a finding.