[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-10980

_____

D.C. Docket No. 4:15-cr-00095-WTM-GRS-1

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

STACY PAUL WADDELL,

Defendant - Appellant.

_____

Appeals from the United States District Court
for the Southern District of Georgia

_____

(December 23, 2020)

Before MARCUS, JULIE CARNES, and KELLY,* Circuit Judges.

JULIE CARNES, Circuit Judge:

_____

* Honorable Paul J. Kelly, Jr., United States Circuit Judge for the Tenth Circuit, sitting by
designation.

All that glitters is not gold.  The customers of defendant Stacy Paul Waddell know too well the truth of that expression.  Defendant established an online store purporting to sell gold and silver at below market rates.  After luring customers to make purchases and wire large sums of money, however, Defendant often discontinued communications with the buyer and failed to ship any goods at all. For a while, Defendant was able to bilk his unwitting customers out of hundreds of thousands of dollars.  His boom times turned to bust, however, when the United States Secret Service began an investigation into his and his company's activities. This investigation led to a federal indictment charging Defendant in a six-count indictment with wire fraud, possession and sale of counterfeit coins, and attempted destruction of evidence.  A jury convicted him on all counts and the district court sentenced him to 183 months' imprisonment.

Defendant appeals his conviction.[1]  As grounds for that challenge, he argues that the district court should have suppressed evidence discovered through warrantless searches of a corporate website and corporate mail.  He further argues that the Government failed to prove that wire transfers for two of the wire fraud counts were "for the purpose of executing" a scheme to defraud.  Defendant also

---

[1] Defendant directly challenges his conviction on the wire fraud counts.  It is not clear whether he is also contending that the information uncovered as a result of the warrantless search of the non-public portion of the website of one of his companies impacted the Government's ability to prove his guilt on the other two counts of conviction: possession and sale of counterfeit coins and attempted destruction of evidence.

2

contends that the Government violated his confrontation and due process rights by withholding evidence and playing an edited videotaped deposition of a deceased fraud victim for the jury. He further appeals his sentence, arguing that the district court erred in its assessment of loss amount and in applying a leadership-role enhancement.

After careful review, and with the benefit of oral argument, we reverse the conviction on Count 1, concluding that insufficient evidence supported that conviction. We also remand for further fact-finding and legal analysis by the district court as to the warrantless search of the computer website, as well as for the district court to conduct a new sentencing proceeding at which it should make factual findings concerning the loss calculation it made when sentencing Defendant. As to Defendant's other allegations of error, we disagree with Defendant and affirm the district court's rulings on those matters.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    Defendant's Scheme to Defraud

Between 2013 and 2015, Defendant operated several companies that purported to sell gold and silver. These companies included Optimal Financial Group Inc. d/b/a Global Gold, PMX Refinery Inc., Southern Precious Metals Exchange. Inc., and Rare Silver Antiques, Inc. Defendant recruited five women—

Courtney Jolley, Debra Sweet, Savannah Anderson, Briana Stiles, and Wanda Sharp—who helped him establish and run the businesses.

Defendant's companies advertised gold and silver on Craigslist.com at below-market rates, with the ads directing customers to call or text Defendant or to visit his website PMXrefinery.com. After receiving an order, he would promise to quickly deliver discounted gold or silver upon receipt of wired funds. But typically, after receiving payment, Defendant either never shipped the goods, or he shipped counterfeit goods.

Federal agents identified dozens of fraud victims by interviewing victims, reviewing bank records, and obtaining data from the PMXrefinery.com website. The Government contends that over the life of his scheme, Defendant obtained nearly $1.2 million from his victims who, after accounting for partial deliveries and refunds, sustained an aggregate actual loss of $841,687.19.

### B.    District Court Proceedings

#### 1.    The Indictment

A fourth superseding indictment charged Defendant with six federal crimes.[2] The first four counts charged Defendant with wire fraud in connection with telemarketing, in violation of 18 U.S.C. §§ 1343 and 2326. Counts One and Three

---

[2] The Government had originally charged Courtney Vinson (aka Courtney Jolley), Defendant's adult daughter, in the indictment, but it dismissed the charges in exchange for her cooperation. The Government did not indict any other employee of Defendant.

involved money that Defendant wired from an Optimal Financial Group bank account to a Florida casino for his personal use. Counts Two and Four involved money that two victims of Defendant's scheme wired into a bank account owned by Optimal Financial Group. Count Five charged Defendant with the possession and sale of counterfeit coins in violation of 18 U.S.C. §§ 2 and 485. Count Six charged Defendant with tampering with documents or proceedings in violation of 18 U.S.C. §§ 2 and 1512(c)(1).

### 2. Defendant's Motions to Suppress Evidence from Warrantless Searches

Defendant appeals the district court's denial of two motions to suppress evidence. One sought to suppress evidence the Secret Service obtained through a warrantless search of the PMXrefinery.com website. The Secret Service accessed the non-public portion, or "back end," of the website containing customer transaction information with the help of the website administrator, Heidi Peterson. She had an administrator's password that provided access to the website shopping cart, which cart contained files documenting Defendant's fraudulent transactions. The other motion sought to suppress evidence the Secret Service obtained by opening two envelopes mailed to Southern Precious Metals, one of Defendant's companies, at the personal residence of Debra Sweet, an employee of one of Defendant's other companies. The district court denied Defendant's motions to

suppress holding that Defendant did not have a protectable Fourth Amendment interest in the corporate website or corporate mail.

### 3. Issues Concerning Charges Related to Defendant's Defrauding of Robert Folkenberg

Robert Folkenberg engaged in multiple purchases with Defendant. Counts 1, 2, and 3 involved wire transfers associated with Folkenberg's transactions with Defendant. Defendant complained that the Government failed to timely disclose all documents, including emails Folkenberg provided to the Government. The district court questioned the Government and concluded that the Government had provided all necessary evidence to Defendant.

Because he had terminal cancer, and with Defendant's consent, the Government deposed Folkenberg before trial. Representing himself, along with stand-by counsel, Defendant waived his right to be physically present at the deposition, but nonetheless conducted a vigorous two-hour cross-examination of Folkenberg by video conference. Defendant later sought to exclude Folkenberg's deposition from trial, raising a Confrontation Clause and due process claim based on the Government's failure to turn over evidence prior to the deposition. The district court denied the claim, concluding that the Government had exceeded its disclosure obligations.

6

4.    Trial and Verdict

During a four-day trial, the Government presented the testimony of 34 witnesses, including eight victims of Defendant's fraud.  Defendant called five witnesses, but did not testify.

During trial, Defendant objected to the Government showing an edited video of Folkenberg's deposition to the jury.  The Government had edited the video to remove withdrawn or overruled objections and pauses between questions.  Defendant argued that editing the video in that manner wrongly removed clips revealing Folkenberg's demeanor.  The court overruled the objection.

The jury deliberated three hours and convicted Defendant on all counts.  The district court subsequently denied Defendant's motions for a new trial and a post-verdict judgment of acquittal.

5.    Sentencing

Defendant's sentencing range under the advisory guidelines included two enhancements contested in this appeal.  First, the district court increased Defendant's offense level by two levels under U.S.S.G. § 3B1.1(c) because Defendant played an aggravating role in an offense involving at least one other participant.  Defendant's stand-by counsel[3] objected that there were no other knowing participants in the crime.  The district court overruled that objection.  The

---

[3] Defendant both represented himself and utilized a stand-by counsel at the sentencing hearing.

7

court found that Defendant's employees, Savannah Anderson and Briana Stiles, knowingly participated in Defendant's crimes based on their extensive assistance to Defendant, including their placement of online ads using dummy email addresses, their filing of corporate documents as purported officers of Defendant's corporations, their opening of bank accounts for Defendant's companies, and their funneling of money to Defendant through blank checks and cash.

Second, as to the loss calculation, the Government's investigation had determined that 77 victims suffered an actual total loss of $841,687 from Defendant's scheme, a loss amount that the PSR recommended. As a loss of more than $550,000, this calculation increased Defendant's offense level by 14 levels pursuant to U.S.S.G. § 2B1.1(b)(1)(H). Defendant objected to this loss calculation.

At the sentencing hearing, the district court adopted the probation officer's position as set out in the addendum to the presentence report, and it overruled Defendant's many objections. The court determined that the Advisory Guidelines provided a total offense level of 29, a criminal history category of III, and a sentencing range of 108 to 135 months. Yet, given that Defendant had nine prior felony convictions, eight of which involved theft and seven of which did not count under the guidelines, the court ruled that Defendant's criminal-history category of III under-represented his record, and it departed upward to a guideline range of 151 to 188 months based on a criminal history category of VI. The court imposed

8

concurrent sentences of 180 months on Count Five and 183 months on all other counts.

6.    The Present Appeal

Defendant timely appealed the denial of his post-trial motions and his sentence.  Defendant raises five issues on appeal.  First, Defendant argues that the district court erred in refusing to suppress evidence obtained from the warrantless searches of the PMXrefinery.com website and Southern Precious Metals' corporate mail, which searches he contends violated the Fourth Amendment.

Second, Defendant argues that his convictions on Counts One and Three for wire fraud should be overturned because the fraud was complete when the customer sent money to the Optimal Financial Group bank account and that the subsequent wire transfers from that account to Defendant's personal account at a casino cannot support a wire fraud conviction.

Third, Defendant maintains that by allowing the edited Folkenberg deposition video to be played before the jury, the district court violated his due process right and his right to confront witnesses because the Government had failed to provide discovery needed to cross-examine Folkenberg and because Defendant was entitled to have the jury view the entire deposition video.

Fourth, as to his sentence, Defendant asserts that the facts did not support a leadership role enhancement.  Specifically, he argues that his employees were not

sufficiently culpable to be considered participants in the fraudulent scheme.

Finally, Defendant argues a 14-level increase in offense level based on loss amount

is not warranted because the Government failed to introduce evidence supporting a

loss amount greater than $550,000.  We address each issue in turn.

## II.    DEFENDANT'S CHALLENGES TO HIS CONVICTION

Defendant contends the Secret Service's warrantless search of Global Gold's

website, PMXrefinery.com, and two pieces of corporate mail sent to Debra Sweet

violated the Fourth Amendment and that any evidence seized in those searches

should have been suppressed.  The district court denied Defendant's motions to

suppress, concluding that Defendant had no Fourth Amendment interest in the

information obtained from the website account or corporate mail.

Motions to suppress involve mixed questions of fact and law.  *United States

v. Jordan*, 635 F.3d 1181, 1185 (11th Cir. 2011).  We review the district court's

factual findings for clear error, construing the facts in the light most favorable to

the Government.  *Id*.  We review the application of law to those facts *de novo*.  *Id*.

### A.    The Secret Service's Search of the PMXrefinery.com Website

#### 1.    Facts Underlying This Issue

Defendant acted in a number of roles for entities that were associated with

Global Gold, including the PMXrefinery.com website, which he alleges was

wrongly searched.  Defendant was the CEO, CFO, and registered agent of Global

Gold.  He was also the CEO, sole incorporator, and registered agent of Optimal

10

Financial Group Inc. d/b/a Global Gold.  Finally, he was sole incorporator and registered agent of PMX Holding Inc.

Defendant hired Heidi Peterson as an independent contractor to design and maintain the PMXrefinery.com website through which Global Gold could buy and sell scrap gold and jewelry.  Global Gold was both the registrant and administrative organization of the website, and Wanda Sharp was Global Gold's point of contact.  In addition to Defendant, Sharp and Peterson purportedly had access to the website's private sections through administrative privileges—a unique login and password giving them unlimited access to all parts of the website—although the parties dispute the extent of that access.

Peterson put her contact information on the website so that customers could contact her with any problems.  Two customers complained to her that PMXrefinery.com was a scam.  Prompted by these complaints, Peterson used her administrative privileges to access the website's shopping cart, investigate the complaints, and print invoices for questioned transactions.  She discovered that Defendant was selling gold bullion, not the jewelry she expected.  Peterson researched local court records and learned that Defendant had several prior criminal convictions for fraud.  She suspected Defendant was using the website for illegal purposes in violation of the Terms of Service of her website administration

11

agreement with Global Gold.  She referred customers to the FBI and contacted local authorities.

By this time, Secret Service Agent Brent Rothschild had already begun investigating Defendant.  Agent Rothschild called Peterson, who told the agent that she was an independent contractor and webmaster who had built the website, kept it up and running over the past two years, and received complaints from Defendant's customers.  Peterson informed Rothschild that she and Defendant each had administrative privileges and unique passwords for the website.

In an email following the teleconference, Agent Rothschild asked Peterson to forward any correspondence she had with complaining customers.  Ten minutes later, Peterson replied stating, "If you would like to access the back end of the shopping cart, you may use my login information."  She then provided her username and password.  The agent sought the advice of an Assistant United States Attorney as to whether he could take Peterson up on her offer.  The AUSA responded that so long as Rothschild had not asked her for the information and because Peterson was not acting as a government agent, it "was okay to do" so.[4]

---

[4]  The advice of this AUSA, who was not involved in the trial or appeal of the case, was off the mark.  Assuming that Peterson met the requirements required for one to consent to a search, her consent to the agent's search of the database would have rendered permissible the agent's search. It would not have mattered that the agent asked for her consent; in fact, typically, it is a law enforcement officer's request to search that precipitates an authorized person's consent.  And at the suppression hearing, the Government argued that Peterson had validly consented to Agent Rothschild's search.  The advising AUSA apparently confused the concept of consent with that of a private search.  Where a private individual not affiliated with law enforcement has made the

12

Given that advice, Agent Rothschild used Peterson's login to access the back end of the website's shopping cart. He printed pages of data showing the names of some customers, their contact information, invoices for their gold orders, and the amounts of their payments. From this information, Agent Rothschild identified 30 new victims of Defendant's fraud.

Defendant moved to suppress any evidence obtained as a result of this warrantless search of the non-public portions of the PMXrefinery.com website. The magistrate judge held a suppression hearing during which the parties focused on whether Peterson had authority to consent to Agent Rothschild's search of the website. Indeed, in both its pre-hearing and post-hearing briefing the Government argued only that the agent's search of the website was based on the valid consent given by Peterson.[5]

The magistrate judge did not reach that issue, however, but instead based his ruling on a ground not urged by the Government: Defendant's lack of standing to contest the search. The judge noted in his Report and Recommendation that

---

initial search, without any request to do so by law enforcement, and has provided the latter with the matter seized, then the Fourth Amendment is not implicated. *See United States v. Jacobsen*, 466 U.S. 109, 119–20 (1984); *United States v. Odoni*, 782 F.3d 1226, 1238 (11th Cir. 2015). Yet, the private search doctrine is not applicable here. Peterson had not generated the list of customer invoices and provided them to the agent. It was the agent who performed that search himself, albeit at Peterson's behest and with her permission.

[5] In contrast, as to the search of the two envelopes mailed to Debra Sweet, the Government did contend that Defendant lacked standing.

Peterson's authority to consent was "irrelevant since [Defendant] has no standing to contest the search's constitutionality." The basis for the judge's conclusion that Defendant lacked standing was the fact that Defendant had "availed himself of the privilege of doing business as a corporation" and therefore could not assert on his own behalf the corporation's Fourth Amendment rights in the website that belonged to Global Gold, notwithstanding Defendant's status as the sole shareholder of the company. On that score, the magistrate judge further found that Defendant had failed to show an "individualized, legitimate and reasonable expectation of privacy" in the website. The magistrate judge noted that Defendant stored no personal items on the website and that the searched information pertained to invoices for sales in the very business Global Gold purported to engage in. Accordingly, the magistrate judge declined to disregard the corporate form under which Defendant had chosen to conduct his business and, given that it was the corporation's property that was searched, he found that Defendant lacked standing to challenge the search.[6] The district court adopted the magistrate judge's Report and Recommendation.

---

[6] Although most courts analyzing the type of issue presented in this case describe it as a question of Fourth Amendment "standing," the Supreme Court has stated that this concept is not distinct from the merits and "is more properly subsumed under substantive Fourth Amendment doctrine." *Byrd v. United States*, 138 S. Ct. 1518, 1530 (2018) (quotation marks omitted). Yet, as most of the cited cases in this opinion use the term "standing," so will we.

2.    Legal Background

Here, without a warrant, a federal agent searched the non-public part of a corporate website containing sales records and related communications; this evidence was later used in the prosecution of Defendant.  The Fourth Amendment affords a person or corporation the right to be free from unreasonable searches and seizures.  *See Byrd v. United States*, 138 S. Ct. 1518, 1526 (2018).  To succeed on a Fourth Amendment challenge, however, a criminal defendant must first show that he has standing to claim protection under that amendment.

Asking whether a defendant has standing to challenge a search is another way of asking whether the defendant had a "legitimate expectation of privacy" in the searched website.  *Id*. (quoting *Rakas v. Illinois,* 439 U.S. 128, 133 (1978)).  To establish a legitimate expectation of privacy, "a defendant must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable."  *United States v. Barber*, 777 F.3d 1303, 1305 (11th Cir. 2015) (quoting *Minnesota v. Carter*, 525 U.S. 83, 88 (1998)).  A defendant may establish a legitimate expectation of privacy based on a common-law interest in real or personal property searched.  *Byrd*, 138 S. Ct. at 1526.  However, a traditional property-based interest in the searched property is not required to establish a legitimate expectation of privacy, though property concepts may aid in evaluating the legitimacy of Defendant's expectation of privacy.  *Id*. at 1526–27.

15

Once standing has been shown, the Government can then defend a

warrantless search on various grounds, including that the defendant, or someone

authorized to do so, consented to the search. We refer to this defense as the "third-

party consent rule." *United States v. Thomas*, 818 F.3d 1230, 1239–42 (11th Cir.

2016). "[T]he touchstone of the third-party consent rule is assumption of the risk,

and a person sharing access to a computer, just as a person sharing access to a

home, exposes himself to a police search based on another's consent." *Id*. at 1242.

The third-party consent rule provides that "a warrantless search is lawful

when a person with actual or apparent authority voluntarily consents to law

enforcement officers conducting a search." *Id*. at 1239–40. "When two people

share common authority over 'premises or effects,' the consent of one person 'is

valid as against the absent nonconsenting person with whom the authority is

shared.'" *Id*. at 1240 (quoting *United States v. Matlock*, 415 U.S. 164, 170

(1974)). "A third party has apparent authority to consent to a search if an officer

could have reasonably believed the third party had authority over the area

searched." *Barber*, 777 F.3d at 1305. If a third party had apparent authority to

consent to the search, courts need not decide whether he had actual authority to do

so. *Id*. at 1306.

"In order to determine whether a person has the authority to consent to a

search of shared property, courts ask whether there is mutual use of the property by

16

persons generally having joint access or control for most purposes." *Thomas*, 818 F.3d at 1240 (internal quotation omitted).  "Another formulation of this standard is whether the defendant has placed the items in question 'in an area over which others do *not* share access and control.'"  *Id.* (quoting *Georgia v. Randolph*, 547 U.S. 103, 135 (2006) (Roberts, C.J., dissenting)).  Thus, courts have found valid consent to a search where the defendant failed to password-protect a computer that was shared with other users or located in a common area.  *See United States v. Stabile*, 633 F.3d 219, 232–33 (3d Cir. 2011) (holding that cohabitant validly consented to search and seizure of computer hard drives when the defendant did not password-protect the computers and the computers were located in a common area of the house); *United States v. King*, 604 F.3d 125, 137 (3d Cir. 2010) (determining that a defendant who placed his hard drive in a shared computer that lacked password protection assumed the risk that another user would consent to a search).  Courts have likewise concluded that an employer having administrative access to an employee's computer could validly consent to a search of the computer, even when the computer is password-protected and contains non-work-related, personal files of the employee.  *United States v. Ziegler*, 474 F.3d 1184, 1192 (9th Cir. 2007).

17

3.    Analysis

As far as the parties were concerned below, the issue in this case was whether the Government's search of the "back end" (non-public section) of a corporate website, with the assistance and permission of its website administrator, was a search based on valid consent.  Indeed, the Government never challenged Defendant's standing to contest the search of the website.  Yet, as the district court never addressed the validity of the administrator's consent and as the absence of standing was the sole basis for the district court's denial of Defendant's motion to suppress the fruits of the website search, we must address standing.[7]

In determining that Defendant lacked a legitimate expectation of privacy in the contents of the private, shopping cart portion of the website, the magistrate judge relied largely on the fact that this website was owned by a corporation, not by Defendant, and that it was only the corporation, not Defendant, that had a legitimate expectation of privacy in the contents of the records searched by the agent.  That is, the judge noted that Defendant's name nowhere appeared on the registration of the website, that it was the companies controlled by Defendant that

---

[7] We have held that when the Government has failed to assert an absence of standing before the district court and when the district court has thereafter failed to consider the question, the Government cannot raise that issue when the district court's ruling is on appeal. *See United States* v. *Ross*, 963 F.3d 1056, 1060–61 (11th Cir. 2020) (en banc).  This case is in a different procedural posture.  As part of its determination of the merits of Defendant's Fourth Amendment challenge, the magistrate judge *sua sponte* based its ruling on Defendant's lack of standing, and the parties have briefed that question before us.  Defendant has not argued that the Government has waived this issue.

18

paid for the services of Peterson, and that Defendant stored no personal documents on the website.

While there is some facial appeal to the magistrate judge's view that the "owner" or sole shareholder of a corporation cannot piggyback onto that entity's Fourth Amendment rights when a search of corporate property uncovers evidence used in a criminal prosecution of the owner, we are not writing on a clean slate as to this issue. Both our Court and the Supreme Court have issued decisions that, while not totally on point, make clear that an organization's status as the legal owner of the premises searched or information obtained is not the dispositive factor as to whether an individual affiliated with that company or organization, and the objects searched, might not also enjoy Fourth Amendment protection in connection with the search.

First, as to the Supreme Court. In *Mancusi v. DeForte*, 392 U.S. 364, 365 (1968), the defendant, an official with a local Teamsters union, was charged with a criminal offense for misusing his position to extort payments from merchants. Some of the records admitted against him, however, had been obtained by a warrantless search, over the defendant's protest, of a union office that the defendant shared with other officials. In deciding whether Mancusi could challenge the search, the Supreme Court first noted that the Fourth Amendment is not limited to "houses," but can also extend to commercial premises. *Id.* at 367.

19

Further, the fact that the seized papers belonged to the union did not imply by itself that an individual could never have personal standing to object to their admission, as the Fourth Amendment does not shield only those who have title to the searched premises. *Id.* at 367–68. The question was whether Mancusi had a reasonable expectation of freedom from governmental intrusion. The Court held that he did. He was legitimately on the premises with custody of these records, and had they been seized from a filing cabinet in his private office in the union headquarters, the Fourth Amendment would have been implicated. That he shared an office that was searched did not result in a different outcome. *Id*. at 369.

A few years before *Mancusi*, our court had issued a decision in *Henzel v. United States*, 296 F.2d 650 (5th Cir. 1961). In *Henzel*, the Government indicted the sole stockholder and president of a company for mail fraud based on false representations he made to purchasers of his company's franchises. *Id*. at 653. The Government had earlier conducted a warrantless search of defendant's office and seized most of the corporation's books and records that were in his office. *Id*. at 651. Our court[8] concluded that defendant had standing to challenge the unlawful search and seizure. *Id*. at 653. We noted that *Jones v. United States*, 362 U.S. 257 (1960) had repudiated the notion that in order to be deemed "a person

---

[8] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this Court adopted as binding precedent all decisions of the former Fifth Circuit rendered before October 1, 1981.

20

aggrieved" by an unlawful search and seizure, an accused must show ownership or possession of the seized property or a substantial possessory interest in the invaded premises. *Henzel*, 296 F.2d at 651. On the particular facts of the case, we found Henzel to be an aggrieved person with standing to challenge the warrantless search. Specifically, Henzel had prepared most of the records that were seized, the records were kept in his office along with some personal belongings, and the search was directed at uncovering incriminating evidence against him. *Id.* at 653.

Of course, that a corporate official or employee may be able to challenge a search of corporate property or premises does not give them free rein in all circumstances to assert Fourth Amendment protection as a result of the search. Instead, "[w]hen corporate property is seized or searched, an individual cannot assert the corporation's Fourth Amendment rights absent a showing that he had an independent privacy interest in the goods seized or the area searched." *United States v. Vicknair*, 610 F.2d 372, 379 (5th Cir. 1980). We so noted in *United States v. Britt*, 508 F.2d 1052 (5th Cir. 1975):

> When a man chooses to avail himself of the privilege of doing business as a corporation, even though he is its sole shareholder, he may not vicariously take on the privilege of the corporation under the Fourth Amendment; documents which he could have protected from seizure, if they had been his own, may be used against him, no matter how they were obtained from the corporation. Its wrongs are not his wrongs; its immunity is not his immunity.

21

*Id.* at 1055. In *Britt*, the defendant was the president, albeit not the sole shareholder, of a company that had committed fraud in the sale of distributorships. The agents had a warrant to search one address and, while doing so, the comptroller of the company sent them to another address where incriminating corporate records were located. *Id.* at 1053–54. Our court found that Britt lacked standing to contest the search. We distinguished *Henzel*, noting that Henzel was the creator of the company and its sole stockholder; that he had prepared the materials seized, which were kept in his own office along with some personal belongings; that he spent most of his working days in that office; and that the search was directed at him. In contrast, we noted that none of those facts pertained to Britt. Indeed, he had not prepared any of the records. *Id.* at 1055. We stated that a corporate officer does not gain standing to challenge the seizure of corporate records "simply because he is a corporate officer." *Id.* at 1056. Instead, to establish standing, the officer must show a nexus between the area searched and the workspace of the defendant. Britt having failed to show that nexus, we found no standing. *Id.*

Of course, in more recent times, computers often fulfill the function of file cabinets, and it is in the files and hard drives of computers that evidence of wrongdoing by the corporation and its employees may most readily be uncovered. In that vein, the Government has cited a more recent case in which the standing of

22

the accused corporate official to challenge the search of corporate computers was addressed. In *United States v. Nagle*, 803 F.3d 167, 173 (3d Cir. 2015), the company at issue employed 140 people, with 25 employees having use of company computers that required a user identification and a password to access the shared network. Armed with a search warrant authorizing the seizure of corporate records, federal agents imaged all the computers on the site of the office compound and uncovered evidence that they sought to use at the trial of the defendant, Joseph Nagle, who owned 50.1% of the company. The agents did not search Nagle's company computer, as he had taken it home with him that evening. *Id.* at 172–73.

Nagle argued that, as the majority owner of the corporation, he had standing to contest the search because the Government had physically intruded on his property and invaded his legitimate expectation of privacy. *Id.* at 176. Examining related cases from other circuits, the Third Circuit concluded that "a corporate shareholder has a legitimate expectation of privacy in corporate property only if the shareholder demonstrates a personal expectation of privacy in the areas searched independent of his status as a shareholder." *Id.* at 176–77. And that requires "some personal connection to the places searched and the materials seized." *Id.* at 178 (quotation marks omitted). The *Nagle* court cited and distinguished our decision in *Henzel*, noting that Henzel was the sole shareholder of his company and had created most of the records that were seized from his own

23

office, and had shown some effort to keep these records private. *Id.* at 178. In contrast, the court concluded that Nagle had failed to show a personal connection to the employee computers and files that were searched. *Id.* As to the server, which was also accessed during the search, the court noted that this was a bit more complicated. *Id.* Nagle clearly had no personal connection to other employees' files and emails on the server. *Id.* As to his own files and emails on the server, to which he did have a personal connection, Nagle failed to show what efforts he had made to keep those materials private and how many other people, if any, may have had access to his own materials. *Id.* at 178–79. Accordingly, the court concluded that Nagle lacked a reasonable expectation of privacy in the material seized by the agents and could not challenge that seizure on Fourth Amendment grounds. *Id.*

Likewise, in *Ziegler* the Ninth Circuit addressed the search of an employee's company computer based on a tip to federal agents from the internet service provider that the employee, defendant Ziegler, had accessed child pornography on the computer. *Ziegler*, 474 F.3d at 1185–86. The company's IT administrator, who had the ability to monitor all company computer usage, confirmed to the agent that the tip was accurate. *Id.* at 1186. Although the agent testified that he told company personnel to maintain a copy of Ziegler's hard drive to avoid it being tampered with, the employees instead understood that the agent had directed them to make a copy of the hard drive. *Id.* at 1186–87. In any event, the company's

24

counsel subsequently told agents that the company would cooperate and voluntarily turn over the employee's computer for the agent to search the contents of data found in it. *Id.* at 1187. Having obtained this consent, the agents did not seek a search warrant. *Id.* at 1187 n.4.

The evidence discovered from Ziegler's computer files in fact revealed the presence of child pornography, and Ziegler moved to suppress the fruits of this warrantless search. *Id.* at 1187. The Ninth Circuit agreed that Ziegler had a subjective expectation of privacy in his office and computer, with the latter being password-protected. *Id.* at 1189. But it noted that the important question was whether Ziegler's expectation of privacy was objectively reasonable. *Id*. The court concluded that it was and that Ziegler therefore had standing to contest the search. *Id.* at 1190. The court explained that Ziegler had a private office that he kept locked and a computer that was password-protected, and therefore any search of that office had to comply with the Fourth Amendment. *Id.* at 1089–90. Nonetheless, the court agreed with the district court that the warrantless search should not be suppressed because company officials had validly consented to the search. *Id.* at 1191–93. Specifically, a third party who possesses "common authority over or other sufficient relationship to the premises or effects being inspected" may give permission to a search by governmental agents. *Id.* at 1191 (quotation marks omitted). And the Ninth Circuit concluded that the company here

25

could validly consent because, even though Ziegler had sought to prevent external access to his computer by setting up a password that would block entry by others, the company nonetheless had the ability at all times to access any employee's computer and employees were on notice that the company had the ability to monitor activity on their computers. *Id.* Thus, although warrantless, the company's consent to the agents' search of Ziegler's computer rendered that search valid under the Fourth Amendment. *Id.* at 1191–92.

The take-away from these cases—sparse though they are in a computer setting—is that a defendant cannot show a reasonable expectation of privacy in the content of a corporation's computer website based solely on the defendant's status as a majority shareholder. Instead, he must show some connection to the premises, items, devices, or particular folders searched in order to claim a valid expectation of privacy. And here Defendant has demonstrated some of the indicia of an objective expectation of privacy recognized by the cited cases, albeit there is also evidence that cuts the other way. As to Defendant's arguments in support of his position, Defendant claims to be the sole shareholder of the relevant companies. Yet, even the evidence on this point is not altogether clear, given the overlapping corporate interests. Some documents show that the website is owned and controlled by Global Gold Refinery and that the registrant for the website is Optimal Financial Group. The Government has not disputed Defendant's assertion

26

that he was the sole shareholder of Optimal Financial Group Inc. d/b/a Global

Gold.  It is unclear, however, who "owns" Global Gold, as an "LE Saxon"

incorporated Global Gold, Inc.

One fact that is clear is that it was Defendant who hired Peterson to set up

the website in the name of pmxrefinery.com and install the shopping cart feature,

albeit the company, not Defendant, paid Peterson for her services.  Further, there is

no evidence that anyone other than Defendant accessed or used the shopping cart

section of the website to conduct business, which was the section searched and

used to identify other victims.  While Defendant maintained no file cabinets in

which these records were contained, he argues that this shopping cart section of the

website was his file cabinet.  In addition, at one point, Defendant exercised his

powers as an administrator of the website to change the administrator password

and assert exclusive control of the website.  He further testified that he had no

knowledge that Peterson had access to the website to perform website maintenance

and upgrades.[9]

On the other hand, the website was hosted not on a corporate computer, but

by an outside company in Chicago.  The shopping cart files related solely to

---

[9]  The evidence, however, is in dispute on this point, as well as to the extent of Defendant's exercise of exclusive control over the website.  Although that matter can be considered as one factor in determining Defendant's expectation of privacy, the question whether Defendant permitted Peterson to access the website from time to time factors in more directly on the question whether Peterson had actual or apparent authority to consent to the search by federal agents.

company business transactions.  And, although the evidentiary support is unclear, the Government argues that the majority of seized documents were commercial summaries that the shopping cart generated automatically from data that customers had entered, with no need for any input by Defendant.  In other words, these summaries were typical corporate records.

In short, on the question of standing, there are shards of evidence here and slivers of evidence there.  Yet, with the district court relying almost totally on the notion that Defendant's use of a corporate form doomed his effort to claim an expectation of privacy in a website created for that company, no findings of fact dealing with the above evidence—some of it disputed—has occurred.  Accordingly, we must remand for the district court to make those findings and, from those findings, to determine whether Defendant has standing to contest a search of the corporation's website.

That the Government below did not raise the issue of Defendant's standing is arguably a hint that it viewed standing as a weak ground on which to contest Defendant's challenge.  Instead, in defending its warrantless search, the Government relied on web administrator Heidi Peterson's consent to allow a federal agent to access the website and search its files.  On remand, the district court should decide both the standing and consent questions.

As to consent, web administrator Peterson was an independent contractor with whom Defendant contracted to create and maintain his company's website. Clearly, Peterson had been given some access by Defendant to the website. But the parties sharply dispute the extent of Peterson's access: that is, whether Defendant was aware that Peterson had access to the shopping cart part of the website and whether Defendant had taken steps to exclude her from the shopping cart.

Moreover, relevant to consent, Defendant was aware that Peterson had placed on the website her telephone number as a contact source for any customers who had questions—and predictably Defendant's cheated customers had more than questions to pose. Further, the terms of Peterson's service agreement indicated that she would not perform any work that violates state or federal law. On the other hand, Peterson's terms of agreement also stated that she would not share her client's information with third parties unless required to do so by law or requested by the client. In any event, Defendant strenuously argues that he had taken steps to keep Peterson out of the non-public shopping cart section of the site, that he was unaware that she could gain access to that area, and that she therefore lacked the "common authority" necessary to validate her consent to a search by the agent.

Because the district court concluded that Defendant had not shown the standing necessary to avail himself of his corporation's Fourth Amendment

29

privilege, it never grappled with the above factual questions. And while the answers to the above questions can serve as factors in considering the question of standing, they are most pivotal on the question of consent. After all, a determination that a third-party could validly consent to a search challenged by a criminal defendant does not necessarily mean that the defendant himself lacked an expectation of privacy for purposes of deciding his standing. An answer to the above questions, however, requires fact-finding from the district court so that there is a factual backdrop against which the even more difficult legal question underlying the Government's position can be decided. Specifically, under what circumstances does an independent contractor who maintains an entity's website have actual or apparent authority to consent to a search of the website?[10] Defendant has suggested that we remand as to this issue and we agree that a remand is necessary to allow the district court to make factual findings and then to decide both the question of standing and of consent.

We, therefore, remand Defendant's challenge of the Government's search of the corporate website's shopping cart section for the district court to make

---

[10] We note that which must surely have become obvious to the Government by this point. Given the evidence that the agent had already gained in his ongoing investigation, it would have been a simple matter to obtain a search warrant of the website. Had this been done, we would not now be required to explore these uncertain legal questions.

30

necessary factual findings and to address both Defendant's standing to contest the search and Peterson's actual or apparent authority to consent to the search.[11]

## B.    The Secret Service's Search of Two Pieces of Corporate Mail

### 1.    Facts Underlying This Issue

Through his investigation, Agent Rothschild learned of a woman named Debra Sweet who was associated with two companies being investigated. Secret Service Agent Lisa Chan interviewed Ms. Sweet. She learned that Defendant had enlisted Sweet[12] to incorporate Rare Silver Antiques, one of the entities that he used to defraud individuals who responded to his advertisements offering gold and silver for sale. The official address of the company was indicated to be an address on Duck Key Court in Tampa, Florida, which was actually the address for Sweet's home. Defendant did not live on Duck Key Court, kept no personal belongings there, conducted no business there, and had no connection at all to that address.

In addition, Defendant had the bank statements sent to the Duck Key Court address for accounts that had been opened at Bank of America for both Rare Silver Antiques and Southern Precious Metals (sometimes called "Southern"), another

---

[11]  If the district court determines that the search violated the Fourth Amendment, it should also determine what information was uncovered as a result of the violation and consider the Government's contention that any error in admitting evidence that should have been suppressed was harmless.

[12]  Ms. Sweet was the mother of a young woman who worked at the casino that Defendant patronized, which young woman Defendant was attempting to date. Defendant indicated that the job was a part-time clerical position for which Defendant paid Sweet $10 an hour.

company he used to defraud purchasers. Indeed, when incorporating Southern Precious Metals, Defendant had listed Sweet's Duck Key Court address as the corporation's address. Accordingly, Sweet received at her Duck Key Court address monthly Bank of America bank statements for both the Rare Silver and Southern Metals accounts.

Observing suspicious charges for strip clubs and the like on the bank statements that were sent to Sweet's home address at Duck Key Court, Sweet eventually became concerned that the moneys being deposited into the bank accounts were obtained through illegal means and that she was involved in some sort of tax evasion or money laundering scheme. Accordingly, she stopped providing any assistance to Defendant or his companies. Nonetheless, Defendant never notified Bank of America to cease sending bank statements to the Duck Key Court address.

During the interview with Secret Service Agent Lisa Chan, Sweet gave Chan previous bank statements for the two companies, as well as the Rare Silver Antiques incorporation documents. A short time later, she also gave Agent Chan two unopened envelopes she had just received at Duck Key Court. Neither envelope indicated the identity of the sender. Both envelopes were addressed to Southern Precious Metals, which again was an entity already known to the investigators, at the Duck Key Court address. One was sent to the attention of

32

Briana Stiles; the other to Savannah Anderson.  Neither Stiles nor Anderson had any connection to the Duck Key Court address.

Upon being handed the mailings, Agent Chan felt the outside of the envelopes, which seemed to her to each contain a bank card.  Thinking that the envelopes, which did not designate the sender, contained bank cards from Bank of America—the entity with which investigators knew the subject companies to have accounts—Agent Chan opened the envelopes.  Instead of a Bank of America card, she discovered a BB&T Bank business debit card in each envelope.  Other than the standard transmittal form typically sent with a debit card, there was no other correspondence attached.  Agent Chan was able to "quickly" find a Tampa address for Briana Stiles through a search of the Florida DMV website, and she interviewed Stiles thereafter.  Stiles indicated that she had met Defendant while she was working as a cocktail waitress at the casino Defendant patronized.  She stated she had run errands for him.  Without prompting from the agent, Stiles also offered that she had opened a SunTrust Bank account and a BB&T bank account for Southern Precious Metals.

In the meanwhile, Agent Rothschild had subpoenaed Southern Precious Metals' account records from BB&T.  Those records confirmed that, in December 2014, Stiles and Anderson had opened a BB&T account for Southern Precious Metals using the Duck Key Court address.  Defendant's name appeared nowhere in

33

the bank records for the BB&T account.  Instead, Briana Stiles was listed as the "CFO" of the company.

2.    Analysis

Although the agents were already aware that Southern Precious Metals had a bank account with Bank of America, Agent's Chan's opening of the envelopes and discovery of BB&T bank cards led to their discovery that Southern also had a bank account with BB&T.  Defendant argues that this knowledge perhaps led to the discovery of other information used by the Government in prosecuting the case. The Government argued, and the district court agreed, that Defendant lacked standing to challenge Agent's Chan's "search" of the envelopes addressed to Southern Precious Metals and to the attention of persons other than Defendant. Alternatively, the court ruled that even if Defendant possessed standing to challenge the search, the suppression motion should nonetheless be denied because the Government would have inevitably discovered the existence of this bank account.

Although it has not been the subject of much attention in our Court, we have held that, notwithstanding the legitimate expectation of privacy in letters and sealed packages, a person who is neither the sender nor the addressee of the letter will typically be unable to demonstrate a legitimate expectation of privacy in the contents of that letter.  *United States v. Smith*, 39 F.3d 1143, 1145 (11th Cir. 1994).

In *Smith*, the agent had received a tip that Smith was receiving LSD through the mail. *Id*. at 1144. Inquiry of the mail carrier revealed that Smith had inquired about mail going to the address of another person: Raquel Kirkconnell. *Id*. Having intercepted the letter before it was delivered to Kirkconnell, the agents approached her and inquired what was going on. *Id*. She responded that the letter actually belonged to Smith, but that he had arranged for it to be sent to her instead of his own address. *Id*. The agent opened the letter and discovered the LSD. Smith moved to suppress the LSD that had been discovered by the agents. *Id*. We held that as "neither the sender nor the addressee of the letter," Smith lacked a legitimate expectation of privacy in the letter.[13] *Id*. at 1145.

Here, Defendant was neither the sender nor the addressee of the letter containing a debit card that was sent by BB&T. Instead, the addressee was the corporation, Southern Precious Metals, with the letter being sent to the attention of someone other than Defendant, to an address over which Defendant had no control. As noted, a shareholder in a company cannot automatically appropriate his corporation's Fourth Amendment rights. Defendant seemingly contests that principle, essentially arguing that a sole shareholder of a company should be able to glom onto the corporation's Fourth Amendment rights under all circumstances.

---

[13] Smith had also equivocated about the extent of his ownership interest in the letter, having testified that he was expecting $200 in cash from the sender, not LSD. *Id*. at 1144–45.

35

We have never so held nor has Defendant pointed to any other court that has embraced such a broad principle. Like the Third Circuit in *Nagle*, we will assume that the sole shareholder must nonetheless demonstrate some personal expectation of privacy in the areas searched independent of his status as a shareholder. And for purposes of the search of the private, shopping cart section of the company's website, Defendant did allege his sole control over that part of the website (albeit the Government disputes that allegation).

Yet, with regard to Agent Chan's search of the two mailings addressed to the attention of Briana Stiles and Savannah Anderson on behalf of a corporation and sent to an address to which neither Stiles, Anderson, or Defendant had any control, Defendant's position—pun intended—does push the envelope. As noted above, in the articles incorporating Southern Precious Metals, Defendant listed the company's address as the Duck Key Court address of Debra Sweet: an address with which Defendant had no proprietary interest or other expectation of privacy. As to the Bank of America accounts opened for both Rare Silver Antiques and Southern Precious Metals, Defendant likewise had used this Duck Key Court address, with bank statements for both companies going to this address. This perhaps might have made some sense for the former company, but not the latter— Southern Precious Metals—as Sweet did no work on those accounts. Nevertheless, when Stiles and Anderson opened a new BB&T account for Southern, the Duck

36

Key Court address was again used.  Defendant's name appeared nowhere in the document opening the new account; instead, Briana Stiles was listed as the "CFO" of the company.

Given that Defendant did everything possible to distance himself from any discernable connection with these fraudulent businesses—he used surrogates to create fake emails and advertise on Craigslist, to set up bank accounts and receive bank records, and to act as registered agents—it seems more than a little incongruous that he now clutches at his status as sole owner of the fraudulent companies for purposes of asserting a Fourth Amendment privilege.  In any event, even assuming that Defendant has stated a legitimate expectation of privacy in the two mailings from BB&T for Southern Precious Metals, we agree with the district court's alternative position that the Government would have inevitably discovered the existence of the BB&T account had Agent Chan never opened the two envelopes that Debra Sweet handed to her.[14]

The inevitable discovery exception allows for the admission of evidence that might otherwise be suppressible if that evidence would have been discovered notwithstanding the police error or misconduct.  *Nix v. Williams*, 467 U.S. 431, 443–44 (1984).  The Government must establish a reasonable probability that the

---

[14]  The district court characterized this alternative ground as being based on the Government's possession of an independent source for the evidence.  Although the two doctrines are closely related, we think that the inevitable discovery principle is more apt here.

police would have discovered the evidence at issue by virtue of ordinary investigation of the evidence or leads already in their possession. *United States v. Johnson*, 777 F.3d 1270, 1274–75 (11th Cir. 2015).

The Government met that burden here.  First, Defendant had no expectation of privacy against the agent—or anyone else for that matter—learning that Briana Stiles and Savannah Anderson were affiliated with Southern Precious Metals. Their names were on the outside of an envelope sent to Debra Sweet's home that she was free to show to anyone.  Which she did when she showed the envelopes to Agent Chan, who, after opening them and discovering the BB&T corporate debit cards issued to Stiles and Anderson, became aware that Southern now had a bank account with BB&T.

Yet, even had she never opened the envelope, Agent Chan would have inevitably learned of Southern Precious Metals' account with BB&T.  Specifically, prior to opening the envelopes, Agent Chan was aware of Defendant's connection to Southern.  The investigative technique pursued by Secret Service agents from the outset of its investigation had been to identify any person associated with or victimized by Defendant, locate that person, and then interview him or her. Indeed, that was how agents came to interview Debra Sweet.  Accordingly, even without opening the envelope, Agent Chan saw Briana Stiles' name as an addressee on the envelope.  Accordingly, based on that new information, she

38

would have tried to find Stiles and interview her.  And indeed, Agent Chan did just that, as shortly after her interview with Sweet, she "quickly" was able to locate an address for Briana Stiles from Florida DMV driver's license records.  Stiles agreed to talk to the agent and without any prompting by the agent volunteered that she had opened up a BB&T and a SunTrust account for Southern Precious Metals.  Thus, had Agent Chan never opened the envelopes, she would have nonetheless spoken to Stiles who would have informed her about the existence of the BB&T bank account for Southern.

Accordingly, on this ground, we affirm the district court's denial of Defendant's motion to suppress any evidence uncovered as a result of Agent Chan's warrantless opening of the two envelopes addressed to Southern Precious Metals and sent to the Duck Key Court address at which Debra Sweet lived.

## C.    Sufficiency of the Evidence on Counts 1 and 3

Defendant contends that the district court erred in denying his motion for judgment of acquittal because "the government failed to prove that the wire transfers in counts 1 and 3 were 'part of the execution of the' consumer-fraud scheme that the government charged."  Defendant argues that the fraudulent scheme had been completed prior to those transfers.

"We review *de novo* a district court's denial of a motion for judgment of acquittal."  *United States v. Carthen*, 906 F.3d 1315, 1319 (11th Cir. 2018).  "We

39

must view the evidence in the light most favorable to the government, drawing all reasonable inferences and resolving all credibility evaluations in favor of the jury's verdict." *Id*. "To uphold the denial of a [motion for judgment of acquittal], we need only determine that a reasonable fact-finder could conclude that the evidence established the defendant's guilt beyond a reasonable doubt." *Id*. (quotation marks omitted).

To prove the crime of wire fraud under 18 U.S.C. § 1343, the Government must establish that Defendant "(1) intentionally participated in a scheme to defraud; and (2) used wire communications to further that scheme." *United States v. Ross*, 131 F.3d 970, 984 (11th Cir. 1997) (quotation marks omitted). In that regard, "[t]he relevant question at all times is whether the [wire[15]] is part of the execution of the scheme as conceived by the perpetrator at the time." *Schmuck v. United States*, 489 U.S. 705, 715 (1989). The wire transmission itself "need not be essential to the success of the scheme to defraud." *United States v. Hasson*, 333 F.3d 1264, 1270, 1273 (11th Cir. 2003). Rather, the wire transmission is "for the purpose of executing the scheme to defraud if it is incident to an essential part of the scheme or a step in the plot." *Id*. (quotation marks omitted).

---

[15] "Mail and wire fraud are analytically identical save for the method of execution." *United States v. Bradley*, 644 F.3d 1213, 1238 (11th Cir. 2011) (footnotes omitted).

40

The challenged convictions here for Counts 1 and 3 involve wire transfers of money fraudulently obtained from Mr. Folkenberg. The purpose of the scheme was for Defendant (1) to fraudulently obtain money from unsuspecting individuals who thought they were buying gold or silver but received instead no precious metals in return and then for Defendant (2) to personally convert those funds to his own use, which usually meant covering Defendant's large and ongoing gambling debts.

Defendant contends that the wire transfers to his casino account cannot support the wire fraud charges of Counts 1 and 3 because the scheme was already complete when the ill-gotten money fraudulently obtained from Folkenberg landed in the Optimal Financial Group business accounts. As to Count 1, Defendant induced Folkenberg to wire $61,250 to an Optimal Financial Group business account at the South Carolina Bank & Trust. Defendant then withdrew $60,000 in cash from that account. Having converted Folkenberg's funds into cash, Defendant subsequently deposited this cash into another Optimal Financial Group business account at the First Bank of Coastal Georgia. From that account, Defendant next wired those funds to his personal account at a Florida casino where he had amassed large gambling debts. It is this last wire transfer that forms the basis of Count 1.

41

The first wiring from Folkenberg to the corporate account clearly supported a wire fraud charge because it was necessary to further the scheme. Indeed, obtaining Folkenberg's money was the scheme. For unexplained reasons, the Government did not charge this wire transaction. Instead, it charged the final downstream wire transfer by Defendant into his personal casino account. Yet, prior to the time that this second wiring occurred, Defendant had already converted Folkenberg's funds into cash; and it was essentially Defendant's cash that was wired to the casino. Accordingly, Defendant argues that because the fraud had already been completed before this second wire transfer, the latter cannot form the basis of Count 1.

To repeat, an integral step of the scheme—in fact, the only reason for the scheme—was Defendant's obtaining personal ownership of the money wired by the victims to the corporate accounts so that Defendant could use that money to pay expenses related to gambling and his other pleasures. As to Count 1, we agree with Defendant that the fraudulent scheme described in that count was complete when Defendant withdrew cash from the Optimal Financial Group business account at the South Carolina Bank & Trust. At that point, he had wrested from the clutches of the corporate account $60,000 of the money that Folkenberg had wired, and he had taken ownership of that money. The scheme was complete as to that money. *See Kann v. United States*, 323 U.S. 88, 93–94 (1944) (holding that

scheme reached fruition when defendants cashed their fraudulently acquired checks because "[b]y cashing it they received the moneys it was intended they should receive under the scheme" and they "had received it irrevocably"). Defendant had exclusive control of the fraudulently obtained funds and the fraud had reached fruition. What he subsequently chose to do with those funds was not incident to an essential part of the fraudulent scheme. *See id.* (subsequent mailing of fraudulently obtained checks by the paying bank to collect from the drawee bank was not in execution of the fraud); *United States v. Smith*, 934 F.2d 270, 272 (11th Cir. 1991) (reversing mail fraud conviction where it was possible defendant could have taken possession of fraudulently obtained money before accounting copy of insurance check passed through the mail because "the mailing was not proven to be necessarily incident to an essential part of the scheme, or a step in [the] plot") (internal quotation marks omitted); *United States v. Redcorn*, 528 F.3d 727, 741–42 (10th Cir. 2008) (transfer from one personal account to another personal account was not "necessary to gain control over the funds" and was not part of the fraudulent scheme).

We find unpersuasive the Government's argument that the downstream wire transfer of money to Defendant's casino account should be sufficient to sustain conviction on Count 1 because it was part of a continuing scheme to defraud Folkenberg. Under the "lulling exception," a wire transfer subsequent to a

43

defendant obtaining control of fraudulently obtained funds may be considered part of the fraudulent scheme if it was "used to lull the scheme's victims into a false sense of security that they are not being defrauded, thereby allowing the scheme to go undetected." *United States v. Hill*, 643 F.3d 807, 859 (11th Cir. 2011). But we see no evidence of lulling here. The record does not reflect that Folkenberg was even aware of Defendant's behind-the-scenes money transfers. Moreover, the Government failed to show how Defendant's transfer of money to his casino account would tend to prevent Folkenberg from discovering the fraudulent scheme.[16] Accordingly, we find that the district court erred in denying Defendant's motion for judgment of acquittal on Count 1 because the fraud was complete before Defendant executed the downstream wire transfer charged in Count 1.

Count 3 is different, though, and we conclude that the Government proved the wire transfer charged in that count furthered the fraudulent scheme. Folkenberg wired the Count 3 funds straight to the Optimal Financial Group business account at the First Bank of Coastal Georgia. Defendant never withdrew the Count 3 funds and converted them into cash. Instead, he caused a wire transfer

---

[16] Perhaps an argument could be made that by converting the victim's wire transfer to the first corporation into cash and then taking that cash, depositing it into a second corporate account, and only then wiring the money to his personal casino account, Defendant had effectively laundered the money and accomplished the same result as if he had directly wired the money from the first account to the casino. The Government does not develop such an argument, however, and we do not opine on what, if any, circumstances might make that argument tenable.

of these corporate funds to be made directly from the corporate account to his

casino to cover gambling debts.  That wire transfer from the corporate account was

essential to the end goal of the scheme, which was Defendant gaining personal

access to the money.  It is true that Defendant treated corporate accounts like they

were his own personal piggybank, but so long as funds remained in the corporate

account there was the possibility that those monies could be drained before

Defendant had used them to fund his personal expenses.  For example, funds

remaining in the corporate account were subject to discovery and withdrawal by at

least one other individual who was an authorized signer on the account.  Even had

there been no other co-signer, so long as the monies remained in the corporate

account, they remained vulnerable to being frozen by the Government or a bilked

victim.  Defendant had to convert the money to his own use, or otherwise move it

from a corporate account, to guard against third parties seizing these corporate

funds.  His wiring of these funds to his casino account accomplished that goal and

hence was in furtherance of the fraudulent scheme.  *See United States v. Rude*, 88

F.3d 1538, 1544–45 (9th Cir. 1996) (fraud not complete until defendants, who

induced a non-profit to transfer funds into a joint Swiss bank account, wired those

funds to accounts they owned and obtained "complete control" of the funds); *see*

*also United States v. Sindona*, 636 F.2d 792, 802 (2d Cir. 1980) (crime not

complete until funds were transferred from account that jury was entitled to find

was effectively controlled by another despite defendant's access to the funds). Accordingly, we affirm the district court's denial of Defendant's motion for judgment of acquittal on Count 3.

### D.    The Government Did Not Violate Defendant's Confrontation or Due Process Rights

Defendant contends that the Government violated his confrontation and due process rights by failing to turn over evidence Folkenberg produced to the Secret Service before being deposed and by removing footage from his deposition video shown to the jury.  Before trial, Defendant sought to exclude Folkenberg's deposition based on the Government's failure to turn over documents and the district court denied his motion.  At trial, the district court overruled Defendant's objection that the Government's showing of an edited video of Folkenberg's deposition to the jury improperly removed evidence of witness demeanor. Defendant appeals those rulings on Confrontation Clause and due process grounds.

We review *de novo* Defendant's claim that his Sixth Amendment confrontation rights were violated.  *United States v. Curbelo*, 726 F.3d 1260, 1271–2 (11th Cir. 2013).  We also review *de novo* Defendant's claim that the Government's withholding of exculpatory evidence violated his due process rights. *See Hays v. Alabama*, 85 F.3d 1492, 1498 (11th Cir. 1996).  For the reasons stated below, we find Defendant's Confrontation Clause and due process claims unpersuasive.

46

1.    The Government Did Not Violate Defendant's Due Process
Rights by Withholding Documents Obtained from Folkenberg

Defendant contends the Government's failure to turn over documents

obtained from Folkenberg in accordance with *Brady v. Maryland*, 373 U.S. 83

(1963), violated his due process rights.  To establish a violation of the duty to

disclose exculpatory evidence, a defendant must prove that (1) the Government

possessed favorable evidence, (2) defendant did not possess the evidence and could

not have obtained it with any reasonable diligence, (3) the Government suppressed

the favorable evidence, and (4) that the evidence is material or creates a reasonable

probability of a different outcome at trial.  *United States v. Elbeblawy*, 899 F.3d

925, 936 (11th Cir. 2018).  Mere speculation or allegations that the Government

withheld material information is insufficient to establish a *Brady* violation.  *United

States v. Naranjo*, 634 F.3d 1198, 1212 (11th Cir. 2011).

Defendant admits "he cannot establish a claim under *Brady*" because he

does not know whether the allegedly undisclosed evidence would be favorable to

his case, but nevertheless asserts "[t]hese unique circumstances require reversal"

based on the off chance that the Government might have violated *Brady*.  We agree

with Defendant that he has failed to establish a *Brady* violation.

We further find there is nothing unique about this case that would warrant

relief.  To the contrary, the record reflects that Defendant received everything the

Government obtained from Folkenberg.  While there were some initial hiccups

47

because certain email attachments could not be opened, and other emails failed to transmit because the file sizes were too large, the record shows that the Government rectified those issues and timely supplied all necessary information to Defendant.

This is but the latest in a long line of motions and arguments by Defendant complaining of the lack of disclosure by the Government.  The district court rejected all of them, remarking at trial that "in 22 years I've never had a case where there's been more effort by the government and the Court to make sure that a defendant got every piece of the discovery and that they got it in a timely manner."  The record supports that observation and we reject Defendant's due process claim based on the Government's alleged failure to turn over evidence.

> 2.    The District Court Did Not Violate Defendant's Confrontation Rights

Defendant contends that the district court deprived him of his Sixth Amendment right to confront a key witness by permitting the Government to play a video of Folkenberg's deposition because (1) the Government had failed to disclose all of Folkenberg's documents and (2) the Government edited the video to remove pauses between questions.  "We have recognized the importance of the right to full cross-examination, particularly when applied to the government's 'star' witness or one who provides an 'essential link' in the government's case." *United States v. Ochoa*, 941 F.3d 1074, 1094 (11th Cir. 2019) (quoting *United*

48

*States v. Lankford*, 955 F.2d 1545, 1548 (11th Cir. 1992)). "However, this right is 'not without limitation,' and a defendant 'is entitled only to an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'" *Id*. (quoting *United States v. Jeri*, 869 F.3d 1247, 1262 (11th Cir. 2017)).

The alleged lack of pretrial disclosure of Folkenberg's documents cannot support a Confrontation Clause claim because, as explained above, the Government provided Defendant all documents it had obtained from Folkenberg. Defendant's Confrontation Clause claim also fails because "the right to confrontation is a trial right, designed to prevent improper restrictions on the types of questions that defense counsel may ask during cross-examination." *Pennsylvania v. Ritchie*, 480 U.S. 39, 52–53 (1987) (emphasis omitted). "The ability to question adverse witnesses, however, does not include the power to require the pretrial disclosure of any and all information that might be useful in contradicting unfavorable testimony." *Id*.; *United States v. Osmakac*, 868 F.3d 937, 956 (11th Cir. 2017) (same). Accordingly, the alleged lack of pretrial disclosure cannot support a Confrontation Clause claim.

Likewise, the presentation of Folkenberg's edited videotaped deposition to the jury did not violate Defendant's right to confrontation. Folkenberg died before trial and the parties agreed to use his videotaped deposition with redactions of

material related to sustained objections. Defendant does not allege that he was denied a full and fair opportunity to cross examine Folkenberg at his deposition or that Folkenberg's responses to questions on cross-examination were cut from the video shown to the jury.

Instead, he objects to the Government's editing of the video to remove long pauses between <u>questions</u> (as opposed to during the witness's answers) that denied him the right to have the jury observe Folkenberg's demeanor between the asking of those questions. Defendant does not allege the video was edited in a way to leave a false impression or deny the jury the chance to observe Folkenberg while he was answering questions. Nor does Defendant identify any particular pause that should not have been deleted because Folkenberg's demeanor during the pause undermined his answers.

In short, the decision to allow the playing of Folkenberg's deposition with the omission of pauses between questions falls squarely within the district court's broad discretion to admit evidence and facilitate an efficient trial. *See Walker v. NationsBank of Fla. N.A.*, 53 F.3d 1548, 1554 (11th Cir. 1995) ("The admissibility of evidence is committed to the broad discretion of the district court, and the decision to exclude certain evidence will be reversed only upon a clear showing of abuse of discretion."); *United States v. Holt*, 777 F.3d 1234, 1268 (11th Cir. 2015) ("The district court has broad discretion in the management of a trial, and we will

50

not reverse absent a clear showing of abuse.").  Accordingly, we deny Defendant's Confrontation Clause claim.

## III.  DEFENDANT'S CHALLENGES TO HIS SENTENCE

Based on its calculation of the Sentencing Guidelines, the district court held that Defendant's guideline range was 108 to 135 months, and the Court departed up from that range to impose a 183-month sentence.  Defendant contends that, in arriving at the appropriate sentencing range, the district court erred by applying a two-level leadership-role enhancement and a 14-level increase based on a finding that the loss to victims of Defendant's fraud totaled $841,687.19.  Defendant objected to the facts cited in the presentence investigation report to support the leadership-role and loss-amount enhancements.  Consequently, the Government bore the burden of eliciting reliable and specific evidence that proved those enhancements by a preponderance of the evidence.  *United States v. Annamalai*, 939 F.3d 1216, 1235 (11th Cir. 2019); *United States v. Martinez*, 584 F.3d 1022, 1027 (11th Cir. 2009).

We review for clear error the facts supporting an enhancement.  *See Annamalai*, 939 F.3d at 1235; *Martinez*, 584 F.3d at 1025.  We review the interpretation of the Sentencing Guidelines *de novo*.  *United States v. Rendon*, 354 F.3d 1320, 1329 (11th Cir. 2003).

A.    **The District Court Did Not Err in Applying a Leadership-Role Enhancement**

"The federal sentencing guidelines provide for an increase in the defendant's base offense level by two levels 'if the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in [subsections] (a) or (b),'" of more than one but less than five participants. *United States v. Williams*, 527 F.3d 1235, 1248 (11th Cir. 2008) (quoting U.S.S.G. § 3B1.1(c)). "The commentary states that to qualify for an adjustment under § 3B1.1, 'the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants.'" *Id.* (quoting U.S.S.G. § 3B1.1, cmt. n.2). Application Note 1 to § 3B1.1 defines "participant" as "a person who is <u>criminally responsible</u> for the commission of the offense, but need not have been convicted." U.S.S.G. § 3B1.1, cmt. n.1 (emphasis added).

The district court applied a 2-level leadership-role enhancement, concluding that Defendant organized, led, managed, or supervised one or more participants: specifically, Briana Stiles and Savannah Anderson. Defendant does not disagree that he supervised these persons, but he argues that because neither was criminally culpable, the enhancement was inapplicable. The district court disagreed, finding that these two women were criminally culpable for the conduct they engaged in at

52

Defendant's behest.[17]  Specifically, Stiles and Anderson placed Craigslist ads using dummy email addresses, incorporated companies for Defendant with, at best, deliberate indifference to the companies' operation, identified themselves as corporate officers although never fulfilling the duties of those roles, opened corporate bank accounts in their capacity as corporate officers, and funneled cash or blank checks to Defendant.  The district court found that their actions reflected criminally culpable conduct, stating that it was "not difficult . . . to conclude by a preponderance of the evidence that they engaged in the conspiracy to commit wire fraud."  Accordingly, the district court applied the leadership-role enhancement.

Defendant argues that Anderson and Stiles cannot be considered to be criminally responsible for their role in Defendant's operation because they lacked an intent to defraud.  *See Williams*, 527 F.3d at 1249 (holding that evidence did not support finding that alleged participant had requisite "intent to defraud").  In deciding whether Stiles or Anderson acted with criminal culpability, the reasonable doubt standard does not apply; instead, the facts need only show by a preponderance of the evidence their criminal responsibility.  *Id*.  We conclude that significant circumstantial evidence supports the district court's finding that Stiles and Anderson engaged in criminally culpable conduct.  Accordingly, the district

---

[17]  The district court also found that Defendant's daughter, Courtney Jolley, was a participant in the criminal scheme.  However, the Government does not seek to support the sentence based on Jolley's participation.  Accordingly, our analysis will focus only on Stiles and Anderson.

court did not clearly err in finding that Stiles or Anderson were participants for purposes of applying the leadership enhancement.

As to the relevant facts, Stiles and Anderson were working at a strip club in Tampa, The Dollhouse, when Defendant induced them to join his enterprise. Neither had any experience with precious metals or any familiarity with Defendant's businesses, nor any reason to believe that Defendant would perceive them as qualified for the titles they were assigned in the company. More importantly, neither ever saw Defendant in possession of anywhere near the amount of gold and silver coins that he was advertising for sale. Anderson ostensibly worked as an office administrator for Defendant. She took messages for Defendant, but did not substantively interact with customers. She also created dummy email addresses and used them to post Craigslist advertisements. Along with those duties, Anderson incorporated at least three business entities for Defendant (My Bullion Source, PMX C&C, Free Gift Card 500, Inc.) and listed herself as registered agent and/or CEO. She did not know what a registered agent or CEO was, did not perform those roles, and did not even know what business these companies engaged in. Anderson also opened up bank accounts for those entities, listing herself as President or CEO. It was her practice to sign blank checks for the bank accounts and give them to Defendant.

Like Anderson, Stiles also created dummy email addresses, posted Craigslist ads, filed business documents identifying herself as a corporate officer, opened bank accounts identifying herself as a corporate officer, and funneled money from those accounts to Defendant. In particular, Stiles amended the Articles of Incorporation for Southern Precious Metals to list herself as Chief Financial Officer, albeit she did not perform the role of a CFO.

The nature of Stiles' and Anderson's employment in high level positions for which they had no experience and whose duties they did not perform combined with their willingness to engage in suspicious activities at Defendant's direction support the district court's finding of a likelihood that they were willing participants in the fraudulent scheme. The district court was entitled to draw inferences regarding the intent of Anderson and Stiles based on all the facts and circumstances of the crime's commission. *Rosemond v. United States*, 572 U.S. 65, 78 n.9 (2014). Though neither woman admitted having knowledge of Defendant's fraud, the deliberate ignorance of criminal activity can be deemed the equivalent of knowledge. *See United States v. Peddle*, 821 F.2d 1521, 1524 (11th Cir. 1987). Moreover, for purposes of applying a leadership-role enhancement to Defendant's guidelines' calculation, Anderson and Stiles can be held criminally responsible even though they did not directly interact with defrauded customers. *See United States v. Zitron*, 810 F.3d 1253, 1262 (11th Cir. 2016) (upholding

leadership-role enhancement where participants knowingly assisted in defendant's criminal tax scheme even though they did not actually help defendant file the false tax returns).

In short, a preponderance of the evidence establishes Anderson and Stiles' culpability as participants based on their willingness to facilitate the creation of suspect corporations, their self-appointment as officers of those corporations despite having no knowledge of corporate operations, their luring of customers with ads placed using dummy email addresses, and their repeated funneling of money to Defendant through cash and blank checks.  They helped create the shady enterprises that enabled Defendant's fraud, notwithstanding ample grounds to question the legitimacy of Defendant's operations as well as the need to do so, given their assumption of roles as corporate officers for these dodgy businesses. The district court therefore did not clearly err in attributing criminal responsibility to Stiles and Anderson for purpose of applying a leadership-role enhancement under the Guidelines.  We therefore affirm the application of a two-level leadership-role enhancement under U.S.S.G. § 3B1.1.

**B**.    **The District Court Failed to Support Its Loss-Amount Calculation**

The district court adopted the loss amount of $841,687 recommended in the presentence investigation report and applied the 14-level enhancement that U.S.S.G. § 2B1.1(b)(1)(H) calls for with such a loss amount.  The district court's

56

assessed loss amount need only be a "reasonable estimate" of the loss caused by

Defendant's fraud. *Annamalai*, 939 F.3d at 1235–36. However, when a defendant

objects to facts in the presentence investigation report that purportedly support the

recommended loss amount, "the government must prove its loss calculation by a

preponderance using reliable and specific evidence." *Id*. (internal quotation marks

omitted).

Here, Defendant objected to the $841,687 loss amount as stated in the

presentence report. He asserted that "the evidence presented at trial did not

establish the proven loss in an amount in excess of $550,000." Except for losses

proven at trial—an amount he maintained was only $144,285—he otherwise

objected to the loss amount attributed to each of the 77 victims identified in the

presentence report. Defendant also objected to inclusion of losses from "Unknown

Alleged Victims," identified by their initials, because "defendant did not conduct

transactions, contact, speak with, communicate, or receive any funds from 35

individuals identified as victims." Defendant further challenged the loss

calculation, arguing that some orders were cancelled, some refunds were granted,

and store credits given, and that some customers breached their purchase contracts.

The probation officer offered a rebuttal of each of those objections in an

addendum to the presentence report. For instance, the probation officer asserted

that the "unknown" victims made purchases through another victim known to

57

Defendant.  The probation officer maintained that those receiving refunds should be included because "they were victims of an intended loss."  And the probation officer argued that "there is no reason to believe" any individual agreed to cancel orders in exchange for refunds.

At the sentencing hearing, the district court otherwise did a very thorough job in its detailed, factual findings, demonstrating its strong attention to the evidence presented at trial and its mastery of that evidence.  Nevertheless, on this discrete matter and despite Defendant's objections, the district court adopted the position of the probation officer without confirming the existence of evidence sufficient to support the loss amount calculation.  And although it is undisputed that the loss-amount evidence at trial related only to eight of the 77 victims identified in the presentence report, and at most proved a maximum loss amount of $264,160,  the district court offered no comment responding to Defendant's objection to counting the loss of each of the remaining 69 victims identified in the PSR.

On appeal, the Government concedes that the district court erred in overruling Defendant's objections without hearing evidence to support the PSR's recommended loss amount.  "A sentencing court must make factual findings sufficient to support the government's claim of the amount of fraud loss attributed to a defendant in a [presentence report]."  *United States v. Cabrera*, 172 F.3d 1287,

58

1294 (11th Cir. 1999).  The trial record includes evidence supporting the loss

amount for only eight of the 77 victims identified in the presentence report and

their loss totaled no more than $264,160.  The Government presented no

testimony, evidence, or argument to confirm the loss amount for the other 69

victims whose purported loss accounted for over $577,000 of the alleged total loss

amount of $841,687.  *Cf. United States v. Bernardine*, 73 F.3d 1078, 1081–82

(11th Cir. 1996) (proffer of evidence insufficient to carry Government's burden of

presenting "reliable and specific" evidence).  Accordingly, on this record,[18] the

district court erred in finding that the evidence of record established a loss amount

exceeding $550,000.

Nonetheless, we need not remand for resentencing if the error was harmless.

A calculation error is harmless when a district court judge clearly states that he

would impose the same sentence regardless of the enhancement, and if the

sentence imposed is reasonable.  *United States v. Perkins*, 787 F.3d 1329, 1341

(11th Cir. 2015) (citing *United States v. Keene*, 470 F.3d 1347, 1349–50 (11th Cir.

2006)).  Indeed, the court upwardly departed from the guideline range, based on

the inadequacy of Defendant's criminal history score to reflect Defendant's danger

---

[18]  It may well be that, on remand, the district court will once again conclude that the loss amount exceeds the threshold level of $550,000.  Indeed, Defendant took in over a million dollars in revenue from his fraudulent venture.  Our concern here is not with the probable accuracy of the recommended loss amount, but with the failure to counter Defendant's objections at sentencing with reliable evidence.

59

to society, stating: "It appears that this sentence is the only thing that will possibly deter Mr. Waddell from future crimes and will protect the public from his future crimes." But as the upward departure was tied to the calculation of Defendant's criminal history, and not his offense level, we cannot be sure that the court would have imposed the same sentence had the offense level been lower than the level 29 calculated, which calculation was based in part on the loss-amount calculation.

While the district court may very well impose the same sentence, even if the loss calculation is lower on remand, we cannot say that the record clearly establishes that the court would impose that sentence under such circumstances. Thus, remand is warranted. "[A] reviewing panel may remand for limited purposes, for broader purposes, or to permit further evidence to be presented on the second round even when a party has been given an opportunity but fails to do so on the first round." *United States v. Martinez*, 606 F.3d 1303, 1304 (11th Cir. 2010). Because the district court ruled on Defendant's objections without giving the Government an opportunity to provide evidence, leeway for the Government to introduce loss amount evidence on remand is warranted and shall be allowed.

## IV.   CONCLUSION

For the reasons explained above, we remand for further fact-finding, followed by a resolution by the district court as to whether fruits of the warrantless search of the computer website should be suppressed. We also remand for the

60

district court to conduct an additional sentencing proceeding at which it makes factual findings concerning the loss calculation, and then determines the sentence to be imposed.  In addition, we reverse Defendant's conviction on Count 1, but reject his challenge to Count 3 based on the alleged insufficiency of the evidence. As to Defendant's other allegations of error, we disagree with Defendant and affirm the district court's rulings on those matters.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**